# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------- x
:
In re                             :          **Chapter 11**
:
THE NORDAM GROUP, INC., *et al.*,     :          **Case No. 18-11699 (MFW)**
:
Debtors.[1]        :          **(Jointly Administered)**
:
-------------------------------------------------------------- x

## DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT POSTPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF THE NORDAM GROUP, INC. AND ITS DEBTOR AFFILIATES

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Jill Frizzley (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul Heath (No. 3704)
Brett M. Haywood (No. 6166)
Megan E. Kenney (No. 6426)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors and*
*Debtors in Possession*

Dated: January 3, 2019

> **THIS DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING VOTES ON THE PLAN AND IS SUBJECT TO FINAL APPROVAL BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are The NORDAM Group, Inc. (7803); Nacelle Manufacturing 1 LLC (3107); Nacelle Manufacturing 23 LLC (5528); PartPilot LLC (5261); and TNG DISC, Inc. (9726).  The Debtors' corporate headquarters and service address is 6910 North Whirlpool Drive, Tulsa, Oklahoma 74117.

# TABLE OF CONTENTS

                                                                                    Page

I. INTRODUCTION ..................................................................................................1
    A.    Definitions and Exhibits .........................................................................1
    B.    Notice to Parties Entitled to Vote .........................................................1
    C.    Overview................................................................................................2

II. BACKGROUND..................................................................................................5
    A.    Debtors' Business Operations................................................................5
    B.    Prepetition Capital Structure.................................................................6
    C.    Formation of Restructuring Committee of Board....................................7
    D.    DIP Financing Facility ..........................................................................7

III. OVERVIEW OF CHAPTER 11 CASES ...........................................................8
    A.    Commencement of Chapter 11 Cases.....................................................8
    B.    Substantive First Day Motions...............................................................8
    C.    Procedural Motions................................................................................8
    D.    Retention of Chapter 11 Professionals....................................................9
    E.    Appointment of Creditors' Committee ...................................................9
    F.    Statutorily Required Financial Report and Schedules and Statements...................9
    G.    Treatment of Executory Contracts and Unexpired Leases in the Chapter 11
        Cases to Date.......................................................................................10
    H.    Global Resolution ................................................................................10

IV. SUMMARY OF PLAN .....................................................................................11
    A.    Treatment of Claims and Interests .......................................................12
    B.    Means for Implementation of Plan .......................................................12
    C.    Treatment of Executory Contracts and Unexpired Leases .....................14
    D.    Settlement, Release, Injunction, and Related Provisions.......................14
    E.    Conditions Precedent to Consummation of Plan ...................................18

V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN .................19
    A.    Continuation of Chapter 11 Cases .......................................................20
    B.    Liquidation under Chapter 7 ................................................................20

VI. VOTING PROCEDURES AND REQUIREMENTS ..........................................20

VII. CERTAIN TAX CONSEQUENCES OF PLAN ................................................22
    A.    Structuring Transactions ......................................................................23
    B.    Ownership and Disposition of New Units .............................................26

VIII. CONFIRMATION OF PLAN .........................................................................29
    A.    Acceptance of Plan by Impaired Class .................................................29
    B.    Best Interests Test................................................................................29
    C.    Feasibility............................................................................................29
    D.    Combined Hearing and Objections.......................................................30

IX. CONCLUSION AND RECOMMENDATION ...................................................32

# I.
# INTRODUCTION

This is the disclosure statement (this "**Disclosure Statement**") of The NORDAM Group, Inc. ("**NORDAM Parent**"), Nacelle Manufacturing 1 LLC, Nacelle Manufacturing 23 LLC, PartPilot LLC, and TNG DISC, Inc. (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**NORDAM**"), in the above-captioned chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  This Disclosure Statement has been filed pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in connection with the solicitation of votes on the *First Amended Joint Postpackaged Chapter 11 Plan of Reorganization of The NORDAM Group, Inc. and Its Debtor Affiliates* dated January 3, 2019 (the "**Plan**"), a copy of which is annexed hereto as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor.

A.    *Definitions and Exhibits*

    1.    Definitions

Unless otherwise defined below, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

    2.    Exhibits

The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are deemed to be part of this Disclosure Statement:

- **Exhibit A** – Plan
- **Exhibit B** – Financial Projections
- **Exhibit C** – Post-Effective Date Corporate Structure

B.    *Notice to Parties Entitled to Vote*

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan; (2) advises parties entitled to vote of their rights under the Plan; (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan; and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

On January 3, 2019, the Bankruptcy Court entered an order (ECF No. 838) (the "**Solicitation Order**") (1) conditionally approving this Disclosure Statement; (2) scheduling a combined hearing for January 30, 2019 at 11:30 a.m. (Eastern Time) (the "**Combined Hearing**") to consider (a) the adequacy of information contained in this Disclosure Statement on a final basis and (b) confirmation of the Plan; and (3) establishing a deadline of January 25, 2019 at 4:00 p.m. (Eastern Time) to object to the adequacy of this Disclosure Statement on a final basis and confirmation of the Plan.

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS. THEREFORE, THE DEBTORS RECOMMEND THAT INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN, A COPY OF WHICH IS ANNEXED HERETO AS <u>EXHIBIT A</u>. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

C.    *Overview*

Since its founding more than five decades ago, NORDAM has been a leader in the aviation and aerospace repair and manufacturing fields, and today is one of the world's largest independently owned aerospace companies with employees across multiple facilities in North America, Europe, and Asia. Despite this long record of success, however, the Debtors faced financial and operating difficulties as a result of substantial non-recurring costs incurred in connection with the *Purchase Agreement for Nacelle Hardware Products*, dated October 18, 2010, between NORDAM Parent and Pratt & Whitney Canada Corp. ("**P&WC**" and such agreement, the "**LTPA**"), under which the Debtors had contracted to develop, manufacture, and support nacelle systems for Gulfstream Aerospace Corporation's ("**GAC**") G500 and G600 aircraft (the "**PW800 Program**"). The challenges associated with the LTPA negatively impacted the Debtors' balance sheet and available liquidity, and jeopardized their historically profitable position and fundamental ability to continue operating.

The Debtors commenced these chapter 11 cases to preserve the value of their estates and to benefit from the breathing spell contemplated by the Bankruptcy Code as they worked towards a consensual resolution of their obligations under the LTPA with key stakeholders. The Debtors accomplished their goals quickly and consensually, and successfully negotiated and consummated a global resolution with GAC and P&WC, which fully and finally resolved the obligations under the LTPA, PW800 Program, and related issues (the "**Global Resolution**"). The Global Resolution has materially improved the Debtors' business operations and liquidity profile, and has well positioned them to emerge from chapter 11 stronger than ever.

All that remains now in the Debtors' restructuring is a further deleveraging of their balance sheet, which is proposed to be accomplished through the Plan and related transactions. Specifically, the Plan contemplates that:

- All creditors will receive payment in full, making them unimpaired and not entitled to vote on the Plan.

- The Debtors will enter into senior secured credit facilities (the "**Exit Facilities**") composed of an asset-based revolving credit facility in a principal amount up to $100 million and a term loan facility in a principal amount up to $240 million, in

each case, on the terms set forth in the Exit Facility Documents. The Debtors have engaged J.P. Morgan Chase Bank, N.A. ("**JPM**") to act as sole and exclusive arranger, on a best efforts basis, of the Exit Facilities.

- A new third-party investor (the "**New Investor**") will contribute Cash in exchange for equity in Reorganized NORDAM Parent on the terms set forth in an investment agreement (the "**Investment Agreement**"), which will be filed in a supplement to the Plan.[2]

- After the Effective Date, holders of Allowed Existing NORDAM Parent Interests in Class 7 will hold (through a newly-formed corporation, NewCo)[3] equity in Reorganized NORDAM Parent, **which equity will be diluted by units issued to the New Investor pursuant to the Investment Agreement.**

- Holders of Allowed Existing NORDAM Parent Interests will receive a Cash payment in an amount to be determined by the Debtors and New Investor and disclosed in the Investment Agreement or otherwise in the Plan Supplement (the "**Class 7 Cash Payment**").

The Debtors believe that, upon consummation of the Plan and the transactions contemplated thereby, in conjunction with the significant costs savings already achieved through the Global Resolution, the post-emergence enterprise will have the necessary capital to invest in and grow its businesses, and will be strongly positioned to resume NORDAM's long history of success.

The Plan provides for the following treatment of Claims and Interests:[4]

| Class | Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[5] |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Each holder of an Allowed Priority Non-Tax Claim will receive: (i) payment in full, in Cash, of the unpaid portion of its Allowed Priority Non-Tax Claim on the Effective Date (or, if payment is not then due, payment in the ordinary course of business) or (ii) such other treatment rendering its Allowed Priority Non-Tax Claim unimpaired. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: $100,000 - $150,000<br><br>Estimated Percentage Recovery: 100% |

---

[2]   The Plan may be amended if and to the extent the Debtors and the New Investor deem it necessary.

[3]   The name of NewCo will be determined before the Effective Date.

[4]   **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

[5]   **Estimated amounts are as of the date hereof and are subject to material change.**

| Class | Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[5] |
|---|---|---|---|---|
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim will receive: (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim on the Effective Date (or, if payment is not then due, payment in the ordinary course of business), (ii) the applicable Debtor's interest in the collateral securing its Allowed Other Secured Claim, or (iii) such other treatment rendering its Allowed Other Secured Claim unimpaired. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: $50,000<br><br>Estimated Percentage Recovery: 100% |
| 3 | Prepetition Credit Facility Claims | Each holder of an Allowed Prepetition Credit Facility Claim will receive payment in full, in Cash, of the unpaid portion of its Allowed Prepetition Credit Facility Claim on the Effective Date. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: $268,843,220[6]<br><br>Estimated Percentage Recovery: 100% |
| 4 | General Unsecured Claims | Except if a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim or has been paid before the Effective Date, at the option of the Debtors, each holder of an Allowed General Unsecured Claim will receive: (i) payment in full, in Cash, on the Effective Date, of the unpaid portion of its Allowed General Unsecured Claim that has become due and payable as of the Effective Date, including Postpetition GUC Interest if requested by the holder of such Claim, and payment in the ordinary course of business of the unpaid portion of its Allowed General Unsecured Claim that has not become due and payable as of the Effective Date or (ii) such other treatment rendering its Allowed General Unsecured Claim unimpaired. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Allowed Amount: $68,000,000 - $73,000,000[7]<br><br>Estimated Percentage Recovery: 100% |
| 5 | Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, Reinstated, discharged, or eliminated as determined by the Debtors or Reorganized Debtors, as applicable, in their discretion on or after the Effective Date. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | Estimated Percentage Recovery: 100% |

---

[6]    Estimated amount includes postpetition interest accruing at the default rate through an assumed Effective Date of January 31, 2019.

[7]    Estimated amount includes principal and outstanding interest on the VIE Note (as defined below) through an assumed Effective Date of January 31, 2019.

| Class | Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Percentage Recovery[5] |
|-------|-------------|-----------|-----------------------------------|-------------------------------------------------|
| 6 | Intercompany Interests | Intercompany Interests will be paid, adjusted, continued, settled, Reinstated, discharged, or eliminated as determined by the Debtors or Reorganized Debtors, as applicable, in their discretion on or after the Effective Date. | Unimpaired<br><br>Not Entitled to Vote (Presumed to accept) | N/A |
| 7 | Existing NORDAM Parent Interests | Each holder of an Allowed Existing NORDAM Parent Interest will receive on the Effective Date its pro rata share of (i) 100% of the NewCo Common Stock and (ii) the Class 7 Cash Payment. | Impaired<br><br>Entitled to Vote | N/A |

D.    *Plan Supplement*

The Debtors intend to file and serve on holders of Interests in Class 7 who are entitled to vote to accept or reject the Plan the following documents, among others contained in the Plan Supplement, at least seven days before the Voting Deadline established by the Solicitation Order:[8]

- the New LLC Agreement;

- the NewCo Organizational Documents;

- any other Amended Organizational Documents of the Reorganized Debtors (only if such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); and

- the Investment Agreement.

Holders of Interests in Class 7 who are entitled to vote to accept or reject the Plan are urged to carefully review these documents, which will be filed on the docket, served on parties in accordance with the Solicitation Order, and made publicly available at https://dm.epiq11.com/NRD/documents under the "Plan Related Documents" tab.

## II.
## BACKGROUND

A.    *Debtors' Business Operations*

NORDAM was founded in 1969, when Raymond H. Siegfried II acquired control of NORDAM, a then near-bankrupt local Tulsa, Oklahoma business. Ray became vice president and general manager of the fledgling business, and he, with his grandfather Ray Siegfried Sr., and eight other employees, set to work transforming the formerly struggling fabrication shop into

---

[8]    The Voting Deadline and other voting procedures and requirements are discussed in greater detail in <u>Article VI</u> of this Disclosure Statement.

a successful aircraft component manufacturing and repair company.  Today, NORDAM is a leading global aerospace enterprise operating on four continents with revenues exceeding $400 million per year.

The Debtors operate in two primary business segments: (1) aircraft manufacturing and (2) aircraft maintenance, repairs, and overhaul services.  Additionally, the Debtors provide a marketplace platform for third parties to buy and sell aviation parts, though these activities represent a small portion of their overall operations.  In fiscal year 2017, the Debtors generated $49.9 million of EBITDA on a consolidated basis and currently employ just over 1,800 employees worldwide, with more than 1,500 located in the United States, primarily in hometown Tulsa, Oklahoma.

The Debtors' manufacturing operations produce a wide variety of aerospace component parts, including transparencies, nacelles, thrust reversers, cabinetry, and radomes, for customers across the business jet, commercial jet, and military sectors.  Historically, the Debtors' manufacturing operations have been primarily directed at "blue chip" customers, such as P&WC, GAC, Boeing, and other major manufacturers of aircraft and aircraft components.  The manufacturing segment operates in five facilities across three locations: three facilities in Tulsa, Oklahoma; one facility in Chihuahua, Mexico; and one facility in Altrincham, England, United Kingdom.

The Debtors also provide maintenance, repairs, and overhaul services for aircraft across the business, commercial, and military markets.  Through this business segment, the Debtors provide routine and out-of-manual repairs and overhauls relating primarily to thrust reversers, nacelles, flight controls, and radomes.

B.      *Prepetition Capital Structure*

       1.      <u>Indebtedness</u>

As of the Petition Date, the Debtors' prepetition capital structure consisted of approximately $285.9 million in total funded debt, made up of (a) a fully-drawn revolving credit facility in an outstanding principal amount of approximately $266.5 million (the "**Prepetition Credit Facility**") and (b) an unsecured promissory note in an outstanding principal amount of approximately $19.2 million (the "**VIE Note**").

       a.      Prepetition Credit Facility

On December 18, 2012, NORDAM Parent entered into the *Fourth Amended and Restated Credit Agreement* (as amended, modified, or restated from time to time, the "**Prepetition Credit Agreement**") with JPM, as administrative and collateral agent (the "**Prepetition Agent**"), and the lenders party thereto (the "**Prepetition Lenders**"), pursuant to which the Prepetition Lenders agreed to provide the Debtors with revolving credit loans and letters of credit, subject to a borrowing base availability.  The obligations under the Prepetition Credit Agreement are secured by a first priority lien on substantially all of NORDAM Parent's property and assets, subject to certain exceptions and exclusions.

On September 22, 2017, NORDAM Parent, the other Debtor entities, and the Prepetition Lenders entered into a fifth amendment to the Prepetition Credit Agreement. Pursuant to this amendment, the Prepetition Lenders agreed to increase the borrowing base of the Prepetition Credit Facility to approximately $266.5 million and to extend its maturity date to June 18, 2018. In exchange, each Debtor (other than NORDAM Parent) agreed to guarantee NORDAM Parent's obligations under the Prepetition Credit Agreement. The Prepetition Credit Facility matured on June 18, 2018 and approximately $266.5 million in principal amount remains outstanding.

b.     VIE Note

NORDAM Parent is also party to the *Credit Agreement*, dated April 4, 2018 (as amended, modified, or restated from time to time, the "**VIE Credit Agreement**"), with Cherokee Partners L.L.C., East Plant Investment L.L.C., and Eight Partners LLC (collectively, the "**VIE Lenders**").[9] Pursuant to the VIE Credit Agreement and certain related transaction documents, the VIE Lenders agreed (i) to advance up to $20 million to the Debtors pursuant to a promissory note bearing annual payment in kind interest at the prime rate and that matured on June 18, 2018 (the "**VIE Note**"), and (ii) that any obligations to the VIE Lenders are unsecured and subordinated to any obligations to the Prepetition Lenders under the Prepetition Credit Agreement. No Debtor other than NORDAM Parent is an obligor with respect to the VIE Note. As of the Petition Date, approximately $19.2 million of principal and $264,000 in accrued interest is due under the VIE Note.

2.     <u>Trade Payables</u>

In the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations.

C.     *Formation of Restructuring Committee of Board*

Before the Petition Date, the Board of Directors of NORDAM Parent appointed an independent Restructuring Committee to consider, evaluate, and approve various strategic alternatives for and on behalf of NORDAM Parent, including a potential chapter 11 filing. The Restructuring Committee was initially composed of Paul Kenneth Lackey, Jr., Thomas J. Allison, and David L. Eaton, with Michael J. Shonka serving as an alternative member. After the Petition Date, Mr. Shonka replaced Mr. Lackey as a member of the Restructuring Committee.

D.     *DIP Financing Facility*

Anticipating that postpetition financing would be necessary in these chapter 11 cases, the Debtors and their advisors vigorously negotiated the terms of a proposed $45 million senior secured superpriority financing facility (the "**DIP Facility**") with the Prepetition Lenders in the weeks leading up to the Petition Date. At the same time, the Debtors began soliciting indications of interest from alternative lenders, intending to continue this process postpetition, in an effort to market test the DIP Facility offered by the Prepetition Lenders. Ultimately, the Debtors

---

[9]    The VIE Lenders are beneficially owned by members of the Siegfried family. The VIE Lenders also own three buildings in or around Tulsa, Oklahoma that are leased by the VIE Lenders to the Debtors.

determined that the DIP Facility offered by the Prepetition Lenders provided the best terms reasonably available to the Debtors under the circumstances.   On August 28, 2018, the Bankruptcy Court entered an order approving the DIP Facility on a final basis (ECF No. 217), which was subsequently amended by further order of the Bankruptcy Court on September 6, 2018 (ECF No. 278).

# III.
# OVERVIEW OF CHAPTER 11 CASES

A.     *Commencement of Chapter 11 Cases*

On July 22, 2018, the Debtors commenced these chapter 11 cases.[10]   The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     *Substantive First Day Motions*

On the Petition Date, the Debtors filed multiple motions seeking various forms of relief from the Bankruptcy Court to facilitate a smooth transition into chapter 11.   The Bankruptcy Court granted substantially all of the relief requested in these motions and entered various orders authorizing the Debtors to, among other things:

- continue the use of their cash management system, bank accounts, and business forms;

- continue paying employee wages and benefits;

- continue rebate and warranty programs;

- continue insurance programs, the processing of workers' compensation claims, and their surety bond program;

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service;

- pay certain prepetition taxes and assessments;

- obtain senior secured superpriority financing and use cash collateral; and

- pay certain critical vendors, shippers, miscellaneous lien claimants, and obligations with respect to prepetition orders of goods to be delivered postpetition.

C.     *Procedural Motions*

The Debtors filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity.   The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

---

[10]   The events leading to the commencement of these chapter 11 cases are set forth in the *Declaration of John C. DiDonato In Support of Debtors' Chapter 11 Petitions and First Day Relief* (ECF No. 3).

- employ professionals utilized by the Debtors in the ordinary course of business; and

- establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals.

D.    *Retention of Chapter 11 Professionals*

The Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these chapter 11 cases.  These professionals include (1) Weil, Gotshal & Manges LLP as counsel to the Debtors, (2) Richards, Layton & Finger, P.A. as co-counsel to the Debtors, (3) Guggenheim Securities, LLC as investment banker, (4) Huron Consulting Services LLC to provide the Debtors a Chief Restructuring Officer, Deputy Chief Restructuring Officers, and other supporting personnel, (5) Epiq Corporate Restructuring, LLC as claims and noticing agent and administrative advisor, (6) Davis Graham & Stubbs LLP as special counsel to the Debtors, and (7) Grant Thornton LLP as provider of accounting, tax, and audit services to the Debtors.

E.    *Appointment of Creditors' Committee*

On August 1, 2018, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these chapter 11 cases (ECF No. 106).  The members of the Committee are (1) Hexcel Corporation, (2) Infosys Limited, (3) Cytec Engineering Materials, Inc., (4) KLX, Inc., (5) Pryer Aerospace LLC – Tulsa, (6) Eaton Corporation, and (7) TNT Machine, Inc.  The Committee retained (1) Morrison & Foerster LLP as counsel, (2) Cole Schotz P.C. as co-counsel, (3) Zolfo Cooper, LLC as financial adviser, and (4) Jefferies LLC as investment banker.

F.    *Statutorily Required Financial Report and Schedules and Statements*

On September 11, 2018, the Debtors filed their periodic report on the value, operations, and profitability, for the annual period ended December 31, 2017 and the year-to-date period ended June 30, 2018, of certain non-Debtor entities in which one or more Debtors hold a substantial or controlling interest required under Rule 2015.3(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (ECF No. 283).  On September 21, 2018, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (ECF Nos. 323-34), which included redacted statements for NORDAM Parent and PartPilot LLC. Contemporaneously therewith, the Debtors filed a motion seeking to seal certain commercially sensitive information in the schedules (ECF No. 321), which was contested by the U.S. Trustee (ECF No. 608).  At a hearing on November 13, 2018, the Bankruptcy Court continued the motion to seal pending confirmation of the Plan.  On December 10, 2018, the Debtors filed amended versions of certain schedules and statements (ECF Nos. 755-760), which included partially unredacted statements for NORDAM Parent and PartPilot LLC.

G.     *Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases to Date*

As of the Petition Date, the Debtors were parties to five leases of nonresidential real property.  Section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has a period of 120 days after the commencement of a chapter 11 case to assume, assign, or reject unexpired leases of nonresidential real property.  Pursuant to section 365(d)(4)(B) of the Bankruptcy Code, a bankruptcy court may, upon a showing of cause, extend the 120 day period by an additional 90 days.  On October 23, 2018, the Bankruptcy Court entered an order extending the period to February 18, 2019 (ECF No. 570).

Pursuant to the Global Resolution (discussed below), the Debtors rejected the LTPA and assumed and assigned six PW800 Program-related executory contracts to GAC (*see* ECF No. 362).  On October 26, 2018, the Bankruptcy Court entered an order approving the Debtors' rejection of an airplane lease and certain related agreements (ECF No. 583).

H.     *Global Resolution*

As described above, before the Petition Date, the Debtors engaged in negotiations with P&WC aimed at reaching a consensual resolution of the LTPA dispute, including P&WC's alleged damage claims.  After the Petition Date, Gulfstream Aerospace Corporation expressed an interest in facilitating such a resolution and funding the restart of the PW800 Program, thereby resuming production of nacelle systems used in GAC's G500 and G600 aircraft, while benefitting the Debtors by eliminating potential future damage claims arising under the LTPA.  In late August 2018, representatives from GAC and the Debtors met in New York to negotiate a comprehensive solution which, after good faith, arm's-length negotiations, resulted in the compromises embodied in the Global Resolution.

The Global Resolution was principally composed of the following interdependent parts:

- rejection of the LTPA, resulting in a rejection damage claim held by GAC as assignee of P&WC under the LTPA;

- the sale of the Debtors' assets used in the PW800 Program to GAC in exchange for (a) a full and irrevocable release of the LTPA rejection damages claim, (b) GAC's payment of up to $18 million of trade liabilities related to the PW800 Program, and (c) certain intellectual property backflow licenses to the Debtors for use outside of the PW800 Program;

- mutual releases among the Debtors, P&WC, and GAC of claims relating to the PW800 Program, the LTPA, and any associated liabilities;

- a shared services agreement among the Debtors and GAC to transition control of the PW800 Program to GAC and long-term operational support from the Debtors;

- a sublease among the Debtors and GAC allowing GAC to operate the PW800 Program within one of the Debtors' facilities;

- a license and sublicense of certain of the Debtors' intellectual property to GAC necessary for the operation of the PW800 Program or related products; and

10

- an interim funding agreement among the Debtors and GAC, pursuant to which GAC could fund the restart and operating costs of the PW800 Program until the closing of the transactions contemplated by the Global Resolution.

On September 4, 2018, the Debtors filed motions seeking approval of the Global Resolution and interim funding in connection therewith (ECF Nos. 233 and 235).  On September 26, 2018, the Bankruptcy Court entered orders approving the Global Resolution and interim funding (ECF Nos. 360 and 362).  The closing of the Global Resolution transactions occurred on September 28, 2018.

## IV.
## SUMMARY OF PLAN[11]

This section of this Disclosure Statement summarizes certain relevant provisions of the Plan.  This section is intentionally not a recitation of the entirety of the Plan, a copy of which is annexed hereto as **Exhibit A**.

For additional information regarding the Plan not discussed in this section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Special Provisions Governing Unimpaired Claims | Article III.C |
| Presumed Acceptance by Class 7 if No Votes Received | Article III.E |
| Means for Implementation of the Plan | Article IV |
| Treatment of Executory Contracts and Unexpired Leases | Article V |
| Provisions Governing Distributions | Article VI |
| Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | Article VII |
| Retention of Causes of Action | Article VIII.G |
| Subordination Rights | Article VIII.H |
| Modification, Revocation, or Withdrawal of Plan | Article X |
| Retention of Jurisdiction | Article XI |
| Miscellaneous Provisions | Article XII |

---

[11]  **This overview is qualified in its entirety by reference to the Plan**.  The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

A.      *Treatment of Claims and Interests*

All holders of Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed Prepetition Credit Facility Claims, and Allowed General Unsecured Claims (Classes 1-4) will receive payment in full on account of their Claims, and Intercompany Claims and Intercompany Interests (Classes 5 and 6) will be reinstated and paid in the ordinary course.  Holders of Existing NORDAM Parent Interests (Class 7) will receive their pro rata share of NewCo Common Stock and the Class 7 Cash Payment.

B.      *Means for Implementation of Plan*

1.      Sources of Consideration for Plan Distributions

Distributions under the Plan will be funded with: (a) Cash on hand, (b) Cash proceeds from the transactions contemplated by the Exit Facilities, (c) Cash proceeds from the New Money Investment, and (d) NewCo Common Stock.

On the Effective Date, the Debtors, Reorganized Debtors, and NewCo are authorized to pay the Class 7 Cash Payment to holders of Allowed Existing NORDAM Parent Interests.

2.      Exit Facilities

The Exit Facilities will be senior secured credit facilities in a principal amount of up to $100 million in the form of an asset-based revolving credit facility and up to $240 million in the form of a term loan facility, as provided for in the Exit Facility Documents.  The Debtors have engaged JPM to act as sole and exclusive arranger, on a best efforts basis, of the Exit Facilities on the terms and conditions contained in the engagement letter and fee letter approved by the Bankruptcy Court on November 29, 2018 (ECF No. 724).

3.      New Money Investment

The New Money Investment contemplates that the New Investor will contribute Cash in exchange for New Units on the terms set forth in the Investment Agreement, which will dilute NewCo's interest in Reorganized NORDAM Parent and fund, among other things, the Class 7 Cash Payment to holders of Allowed Existing NORDAM Parent Interests.  **Please note that the New Money Investment will dilute the Interests held by holders of Existing NORDAM Parent Interests in Class 7** (indirectly by diluting New Units held by NewCo).

4.      Issuance and Distribution of NewCo Common Stock

The issuance of NewCo Common Stock through the Plan and Tax-Free Reorganization will be authorized by entry of the Confirmation Order without further action by holders of Claims or Existing NORDAM Parent Interests, and the NewCo Common Stock will be deemed duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of

the NewCo Common Stock under the Plan and the Tax-Free Reorganization will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance.

The NewCo Organizational Documents and the *Preincorporation Subscription Agreement* dated March 27, 1977 will be binding on all Entities (and their respective successors and assigns) receiving or holding the NewCo Common Stock regardless of whether any such NewCo Common Stock are received or held on or after the Effective Date, in each case, pursuant to the Plan. Any Entity receiving or holding NewCo Common Stock, as a condition thereof, will be, and will be deemed to be, bound by (a) the NewCo Organizational Documents and (b) the *Preincorporation Subscription Agreement* dated March 27, 1977 and the restrictions on transfer and ownership set forth therein, in both cases as may be amended or modified from time to time after the Effective Date in accordance with their terms.

5.    Tax-Free Reorganization

In connection with NORDAM Parent's intention to reorganize into a holding company structure, the following transactions will occur in the following order before the New Money Investment by the New Investor, and the Debtors or Reorganized Debtors (as applicable) may take all actions necessary or appropriate to effectuate such transactions (collectively, the "**Tax-Free Reorganization**"):[12]

a.    NORDAM Parent will form NewCo, which in turn will form Merger Sub.

b.    (i) NORDAM Parent will merge with Merger Sub, with NORDAM Parent continuing as the surviving corporation (the "**Merger**"),[13] (ii) each Existing NORDAM Parent Interest issued and outstanding immediately before the Merger will be converted into one share of NewCo Common Stock, which will have the same designations, rights, powers and preferences, and the qualifications, limitations and restrictions thereof, as each Existing NORDAM Parent Interest converted in the Merger, subject to section 1123(a)(6) of the Bankruptcy Code and other applicable law, and each certificate representing an Existing NORDAM Parent Interest issued and outstanding immediately before the Merger will, at the effective time of the Merger, be cancelled, and each holder thereof shall receive a certificate representing NewCo Common Stock into which the Existing NORDAM Parent Interest formerly represented by such certificate will have been converted in the Merger, without the need for surrender or exchange thereof, and (iii) the units of Merger Sub outstanding immediately before the Merger (which units, immediately before the Merger, will be held by NewCo) will be converted into all of the issued and outstanding capital stock of NORDAM Parent, such that

---

[12]   An organizational chart setting forth the post-Effective Date corporate structure of NORDAM is annexed hereto as **Exhibit C**.

[13]   The name of NORDAM Parent after the Merger will be determined before the Effective Date.

NORDAM Parent, upon the effectiveness of the Merger, will become a wholly-owned subsidiary of NewCo.

    c.        NORDAM Parent will elect to be treated as a qualified subchapter S subsidiary for U.S. federal income tax purposes, as a result of which NewCo is intended to be treated as an S corporation for U.S. federal income tax purposes.  After such election, NORDAM Parent will convert to a Delaware limited liability company (the "**NORDAM Parent Conversion**").

No vote of persons holding shares of NORDAM Parent immediately before the Tax-Free Reorganization will be required to effect the Tax-Free Reorganization, and no such person will have appraisal rights as a result of the Tax-Free Reorganization.  The NewCo Organizational Documents as well as the *Preincorporation Subscription Agreement* dated March 27, 1977, including the restrictions on transfer and ownership therein, will apply to the shares of NewCo Common Stock and the holders thereof after the Tax-Free Reorganization as the NewCo Organizational Documents applied to the shares of NORDAM Parent and the holders thereof immediately before the Tax-Free Reorganization.

C.     *Treatment of Executory Contracts and Unexpired Leases*

As set forth in <u>Article V</u> of the Plan, on the Effective Date and subject to the payment of any Cure Amounts, all prepetition executory contracts and unexpired leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor, other than the executory contracts or unexpired leases (1) identified on the Schedule of Assigned GAC Contracts, which will be deemed assumed and assigned to GAC on the Effective Date subject to payment of any Cure Amounts, (2) identified on the Schedule of Rejected Contracts, which will be deemed rejected on the Effective Date, or (3) subject to a motion to reject that is pending on the Confirmation Date.

D.     *Settlement, Release, Injunction, and Related Provisions*

    1.     <u>Compromise and Settlement of Claims, Interests, and Controversies</u>

As set forth in <u>Article VIII.A</u> of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and will be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that any holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution received on account of such Allowed Claim or Interest.

The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their estates, and holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described in the Plan will be deemed nonseverable from each other and from all other terms of the Plan.

2.     Discharge of Claims

As set forth in Article VIII.B of the Plan, pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever regardless of whether any property is distributed or retained pursuant to the Plan on account of such Claims and Interests and regardless of whether the holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of these chapter 11 cases will be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is unimpaired by the Plan.    The Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  Nothing in Article VIII.B of the Plan shall affect the rights of holders of Claims or Interests to seek to enforce the Plan, including the distributions to which holders of Allowed Claims or Interests are entitled to receive under the Plan.

3.     Releases by Debtors

**As set forth in Article VIII.C of the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the Debtors, the Reorganized Debtors, and each of their respective current and former affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective estates, including any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including avoidance actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors or their estates would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Prepetition Credit Documents, the DIP Documents, the formulation, preparation, dissemination, negotiation of the Plan, this Disclosure Statement, the Exit Facility Documents, the Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, this Disclosure Statement, or these chapter 11 cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating**

15

to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in **Article VIII.C** of the Plan do not (a) release any Entity's Effective Date or post-Effective Date obligations, rights, or defenses arising under the Plan or any document, instrument, or agreement assumed or executed in connection with the Plan (including documents, instruments, or agreements included in the Plan Supplement) or (b) affect the rights of holders of Allowed Claims and Interests to receive distributions under the Plan.

4.    Releases by Holders of Claims and Interests

As set forth in **Article VIII.D** of the Plan, as of the Effective Date, for good and valuable consideration, the Released Parties will be and are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged by:

(a)    holders of Interests who vote to accept the Plan;

(b)    holders of Claims or Interests who are unimpaired under the Plan and who do not timely object to the third party releases provided pursuant to **Article VIII.D** of the Plan; *provided that* holders of unimpaired Claims will not release or be deemed to have released the Debtors or Reorganized Debtors with respect to such unimpaired Claims pursuant to **Article VIII.D.2** of the Plan;

(c)    holders of Interests whose vote to accept or reject the Plan was solicited but who did not vote either to accept or to reject the Plan and did not opt out of granting the releases set forth in the Plan;

(d)    the Committee and its members;

(e)    the Prepetition Secured Parties;

(f)    the DIP Agent and DIP Lenders;

(g)    the Exit Facility Agents and Exit Facility Lenders;

(h)    the New Investor; and

(i)    with respect to each of the foregoing Entities in clauses (a) through (h), all Related Parties to the maximum extent;

in each case in their capacity as such from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their estates), that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including avoidance actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the

Debtors or their estates would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Prepetition Credit Documents, the DIP Documents, the formulation, preparation, dissemination, negotiation of the Plan, this Disclosure Statement, the Exit Facility Documents, the Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, this Disclosure Statement, or these chapter 11 cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Article VIII.D</u> of the Plan do not (a) release any Entity's Effective Date or post-Effective Date obligations, rights, or defenses arising under the Plan or any document, instrument, or agreement assumed or executed in connection with the Plan (including documents, instruments, or agreements included in the Plan Supplement) or (b) affect the rights of holders of Allowed Claims and Interests to receive distributions under the Plan.

5.    Exculpation

As set forth in <u>Article VIII.E</u> of the Plan, except as otherwise specifically provided in the Plan, no Exculpated Party will have or incur liability for, and each Exculpated Party will be released and exculpated from, any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, these chapter 11 cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, this Disclosure Statement, the Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, this Disclosure Statement, the filing of these chapter 11 cases, the pursuit of confirmation or consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Exculpated Parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan will be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.    Injunction

As set forth in <u>Article VIII.F</u> of the Plan, all entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Article VIII.C</u> or <u>Article VIII.D</u> of the

Plan, will be discharged pursuant to <u>Article VIII.B</u> of the Plan, or are subject to exculpation pursuant to <u>Article VIII.E</u> of the Plan, will be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Article VIII.E</u> of the Plan with respect to the Exculpated Parties): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such Claims or Interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

       7.     <u>Release of Liens</u>

Except (a) with respect to the Liens securing (i) the Exit Facilities, and (ii) to the extent elected by the Debtors, with respect to an Allowed Other Secured Claim in accordance with <u>Article III.B.2</u> of the Plan; or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates will be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests must execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to the Reorganized Debtors and their successors and assigns.

E.     *Conditions Precedent to Consummation of Plan*

       1.     <u>Conditions Precedent to Effective Date</u>

The following are conditions precedent to the occurrence of the Effective Date of the Plan, which the Debtors will cause to occur as soon as practicable after the Bankruptcy Court's entry of the Confirmation Order:

           a.     the Bankruptcy Court shall have entered the Confirmation Order and such order shall have become a Final Order;

b.       the Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.C of the Plan;

c.       the conditions to effectiveness of the Exit Facility Credit Agreements shall have been satisfied or waived in accordance with the terms thereof, and such agreements and any other Exit Facility Documents required to be in effect on the Effective Date shall be in full force and effect and binding on all parties thereto;

d.       the conditions to effectiveness of the Investment Agreement and the New LLC Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement and any other related documents required to be in effect on the Effective Date shall be in full force and effect and binding on all parties thereto;

e.       all Restructuring Expenses incurred or estimated to be incurred through the Effective Date shall have been paid in full in Cash;

f.       the Amended Organizational Documents and the NewCo Organizational Documents shall be in full force and effect;

g.       the New Units shall have been issued in accordance with the terms of the Amended Organizational Documents, Investment Agreement, and New LLC Agreement;

h.       the distribution of NewCo Common Stock and Class 7 Cash Payment as contemplated by Article III.B.7 of the Plan shall have occurred in accordance with the terms thereof; and

i.       any other documents, instruments, and agreements necessary to effectuate the Plan shall have been effected or executed.

2.       Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in Article IX of the Plan, other than the condition set forth in Article IX.A.1 of the Plan, may be waived only by consent of the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

## V.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the most likely alternatives to the Plan are (A) continuation of these chapter 11 cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (B) a liquidation under chapter 7 of the

Bankruptcy Code. The Debtors will set forth the factual bases in support of the Plan at the Combined Hearing and will establish, among other things, that the Plan is preferable to either continuation of these chapter 11 cases or a liquidation under chapter 7 of the Bankruptcy Code.

A.      *Continuation of Chapter 11 Cases*

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Any alternative plan could provide for a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets. As will be established by the Debtors at the Combined Hearing, however, the Debtors believe that the Plan enables their stakeholders to realize the most value under the circumstances.

Alternatively, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, and as will be established by the Debtors at the Combined Hearing, the Debtors do not believe that a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims and Interests than such holders will receive under the Plan.

B.      *Liquidation under Chapter 7*

If no plan can be confirmed, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their stakeholders in accordance with the priorities established by the Bankruptcy Code. As will be established by the Debtors at the Combined Hearing, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to stakeholders than those provided for in the Plan because of, among other things, the delay resulting from the conversion of these chapter 11 cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

## VI.
## VOTING PROCEDURES AND REQUIREMENTS

The Debtors are providing (A) this Disclosure Statement, and the exhibits annexed hereto, (B) the Plan, and (C) a ballot, with detailed voting instructions, including deadlines, procedures, instructions for casting a ballot, and tabulation standards (collectively, a "**Solicitation Package**"), to holders of Interests in Class 7 as of January 7, 2019. Because all other Classes of Claims or Interests are unimpaired and presumed to accept, no other such Classes are entitled to vote.

In addition to the Solicitation Packages to be mailed out following the conditional approval of this Disclosure Statement, the Debtors intend to file the following documents, among others contained in the Plan Supplement, at least seven days before the Voting Deadline set forth below:

- the New LLC Agreement;

- the NewCo Organizational Documents;

- any other Amended Organizational Documents of the Reorganized Debtors (only if such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); and

- the Investment Agreement;

Before voting to accept or reject the Plan, holders of Interests in Class 7 should carefully review the materials contained in the Solicitation Package and the above documents, which will be filed on the docket, served on parties in accordance with the Solicitation Order, and made publicly available at https://dm.epiq11.com/NRD/documents under the "Plan Related Documents" tab. All descriptions of the Plan set forth in this Disclosure Statement are qualified in their entirety by reference to the Plan.

The Debtors have engaged Epiq Corporate Restructuring, LLC as their voting and solicitation agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT VIA EMAIL TO TABULATION@EPIQGLOBAL.COM WITH A REFERENCE TO "NORDAM" IN THE SUBJECT LINE OR THE MAILING ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (EASTERN TIME) ON JANUARY 28, 2019, UNLESS EXTENDED BY THE DEBTORS.**

If a ballot is damaged or lost, you may contact the Voting Agent using the below contact information to receive a replacement ballot. Any ballot that is executed and returned but which does not indicate a vote for acceptance or rejection of the Plan will not be counted for purposes of determining acceptance or rejection of the Plan. Such ballots may, however, be used to determine whether the voting party has chosen to opt out of the releases set forth in the Plan.

If you have any questions concerning the voting procedures, you may contact the Voting Agent at:

**NORDAM Ballot Processing**
**c/o Epiq Corporate Restructuring, LLC**
**10300 SW Allen Boulevard**
**Beaverton, Oregon 97005**
**Tel: (877) 868-9284 or (503) 520-4473**
**Email: tabulation@epiqglobal.com with a reference to "NORDAM" in the subject line**

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent using the above contact information and may be accessed at https://dm.epiq11.com/NRD/documents under the "Plan Related Documents" tab.

# VII.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of Existing NORDAM Parent Interests. This discussion does not address the U.S. federal income tax consequences to the New Investor or holders of Claims or Interests who are unimpaired under the Plan.

This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign tax consequences, or federal tax consequences other than income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes (other than the Debtors and the Reorganized Debtors treated as S corporations or partnerships as described below), persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long-term residents of the United States, persons who received their Interests as compensation or who acquired their Interests in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). Additionally, this discussion does not address the Foreign Account Tax Compliance Act.

This discussion assumes that all Existing NORDAM Parent Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISOR FOR THE U.S. FEDERAL,**

**STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.      *Structuring Transactions*

NORDAM Parent is treated as an S corporation for U.S. federal income tax purposes and each of the other Debtors (all of which are wholly owned subsidiaries of NORDAM Parent) are treated as entities disregarded as separate from their owner, NORDAM Parent, for U.S. federal income tax purposes, with the exception of TNG DISC, Inc., which is treated as a corporation for U.S. federal income tax purposes.  As an S corporation or disregarded entity, NORDAM Parent and the other Debtors (other than TNG DISC, Inc.) are not themselves subject to U.S. federal income tax.  Instead, each shareholder of NORDAM Parent is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction and credit of such Debtors.  Accordingly, the U.S. federal income tax consequences of the Structuring Transactions (as defined below) generally will not be borne by the Debtors, but instead will be borne by the shareholders of NORDAM Parent.  **If you are a shareholder of NORDAM Parent, you are urged to consult your tax advisor.**

In accordance with the Plan, the following transactions will occur in order on or before the Effective Date (or as soon as practicable thereafter) (collectively, the "**Structuring Transactions**"):

1.      NORDAM Parent will form NewCo, which in turn will form Merger Sub.

2.      (a) NORDAM Parent will merge with Merger Sub, with NORDAM Parent continuing as the surviving corporation, (b) each Existing NORDAM Parent Interest issued and outstanding immediately before the Merger will be converted into one share of NewCo Common Stock, which will have the same designations, rights, powers and preferences, and the qualifications, limitations and restrictions thereof, as each Existing NORDAM Parent Interest converted in the Merger, subject to section 1123(a)(6) of the Bankruptcy Code and other applicable law, and each certificate representing an Existing NORDAM Parent Interest issued and outstanding immediately before the Merger will, at the effective time of the Merger, be cancelled, and each holder thereof shall receive a certificate representing NewCo Common Stock into which the Existing NORDAM Parent Interest formerly represented by such certificate will have been converted in the Merger, without the need for surrender or exchange thereof, and (c) the units of Merger Sub outstanding immediately before the Merger (which units, immediately before the Merger, will be held by NewCo) will be converted into all of the issued and outstanding capital stock of NORDAM Parent, such that NORDAM Parent, upon the effectiveness of the Merger, will become a wholly-owned subsidiary of NewCo.

3.      NORDAM Parent will elect to be treated as a qualified subchapter S subsidiary for U.S. federal income tax purposes, as a result of which NewCo will be treated as an S corporation for U.S. federal income tax purposes.  After such election, NORDAM Parent will convert to a Delaware limited liability company.

4.      Pursuant to the New Money Investment, the New Investor will subscribe for New Units by contributing Cash to Reorganized NORDAM Parent in exchange for the issuance of New Units in accordance with the Investment Agreement.  Following, and as a result of, the New Money Investment, Reorganized NORDAM Parent is intended to be treated as a partnership for U.S. federal income tax purposes.

5.      The Class 7 Cash Payment will occur, whereby Cash in an amount to be determined by the Debtors and New Investor and disclosed in the Investment Agreement or otherwise disclosed in the Plan Supplement will be (a) paid from Reorganized NORDAM Parent to NewCo (the "**NORDAM Parent Cash Payment**") and then (b) paid from NewCo to holders of Allowed Existing NORDAM Parent Interests (the "**NewCo Cash Payment**").

* * * * *

1.      <u>Tax-Free Reorganization</u>

The Tax-Free Reorganization is intended to be treated as a reorganization under section 368(a)(1)(F) of the Tax Code.  Section 368(a)(1)(F) of the Tax Code provides that a reorganization includes a mere change in identity, form, or place of organization of one corporation, however effected.  Furthermore, the Treasury Regulations provide that, in the case of a reorganization qualifying under section 368(a)(1)(F) of the Tax Code, the resulting corporation will be treated for certain purposes of the Tax Code just as the transferor corporation would be treated had there been no reorganization.  Accordingly, except as otherwise described in the following discussion regarding the New Money Investment and the NORDAM Parent Cash Payment, (a) the Tax-Free Reorganization is not expected to give rise to any taxable gain or loss to the Debtors or the shareholders of NORDAM Parent, (b) the basis and holding period of NORDAM Parent's assets is expected to be unchanged and (c) the basis and holding period of NewCo stock received in the Merger is expected to be equal to the basis and holding period of the Existing NORDAM Parent Interests exchanged therefor.

2.      <u>New Money Investment; Class 7 Cash Payment</u>

Although the Tax-Free Reorganization is expected to be treated as a mere change in form and generally result in substituted basis and tacked holding periods for the transferred and exchanged equity interests and underlying assets, the Structuring Transactions, in part, are expected to be treated as a taxable exchange because of the New Money Investment and contemporaneous NORDAM Parent Cash Payment.

The New Money Investment and NORDAM Parent Cash Payment, taken together, are expected to be treated as (a) a sale (a so-called "disguised sale" as contemplated under section 707 of the Tax Code) by NewCo to the New Investor of an undivided interest in a portion of NORDAM Parent's assets, immediately followed by (b) the contribution (i) by NewCo of the non-sold portion of NORDAM Parent's assets to a newly formed partnership in exchange for partnership interests and (ii) by the New Investor of cash and the purchased portion of NORDAM Parent's assets to a newly formed partnership in exchange for partnership interests.

As a result, NewCo and the New Investor will be treated as partners in a new partnership that holds all of NORDAM Parent's assets.

Certain tax consequences, resulting from these aspects of the tax treatment of the Structuring Transactions, are discussed below.

Except to the extent of the disguised sale, NewCo is not expected to recognize any gain or loss as a result of the Structuring Transactions. NewCo will recognize gain or loss (allocable to each shareholder of NewCo) in an amount equal to the difference, if any, between the cash received in the disguised sale and its adjusted tax basis in the assets sold in the disguised sale. Such gain or loss may be capital gain or loss or ordinary income or loss depending on the nature of such assets. Capital gain, allocable to the shareholders of NewCo, on the sale of assets held for more than one year is eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. The assets sold in the disguised sale will have basis, in the hands of the deemed acquiror of such assets (the New Investor), equal to their fair market value.

Because NewCo will be treated as an S corporation for U.S. federal income tax purposes, any gain or loss recognized by NewCo as a result of the disguised sale will pass-through to its shareholders, which will consist of the shareholders of NORDAM Parent immediately before the Tax-Free Reorganization. A shareholder's basis in its NewCo stock will generally be increased by the amount of any income or gain of NewCo allocable to the shareholder, and decreased (but not below zero) by any items of loss and deduction allocable to the shareholder and by distributions not includible in the income of the shareholder by reason of section 1368 of the Tax Code (as a tax-free return of basis). The amount of losses and deductions of NewCo that may be taken into account by a NewCo shareholder for any taxable year will be limited to the amount of (a) its adjusted basis in NewCo stock and (b) any debt owed by NewCo to such shareholder. Losses and deductions in excess of a shareholder's adjusted stock basis may generally be carried forward (such excess, a "suspended loss"). Suspended losses are non-transferrable, and may be taken into account by a shareholder in a subsequent year when its NewCo stock basis increases. **Each shareholder of NewCo is urged to consult its tax advisor regarding the availability of any suspended losses, including any such losses incurred by a holder of Existing NORDAM Parent Interests before the Tax-Free Reorganization.**

After the New Money Investment and NORDAM Parent Cash Payment, the basis and holding period of NORDAM Parent's assets will be the same as the basis and holding period of such assets in the hands of NewCo and the New Investor immediately before the deemed contribution of such assets to NORDAM Parent (taking into account the change in basis, if any, and the change in holding period resulting from the disguised sale of such assets to the New Investor).

As described in the Article III.B.7 of the Plan, holders of Existing NORDAM Parent Interests will receive the NewCo Cash Payment. The NewCo Cash Payment may be a taxable distribution to such holders. Generally, the taxation of a distribution by NewCo, an S corporation, depends on the amount, if any, of its accumulated earnings and profits.

If NewCo has accumulated earnings and profits, the treatment of a distribution will be viewed as having three tiers. The first tier consists of distributions from the "accumulated

adjustments account," which, because an S corporation is a pass-through entity for U.S. federal income tax purposes, measures income that has been taken into account by the shareholders of the S corporation but has not previously been distributed.  Distributions from the accumulated adjustments account are treated first as a tax-free recovery of the shareholder's adjusted stock basis (on a dollar-for-dollar basis), but not below zero, and second, to the extent the amount of the distribution from the accumulated adjustments account exceeds adjusted stock basis, as gain from the sale or exchange of NewCo shares.  The second tier consists of the amount of any distributions in excess of the amount in the accumulated adjustments account, which amount will be treated as a taxable dividend to the extent paid out of NewCo's accumulated earnings and profits, and will be includible by the NewCo shareholder as ordinary income when received. The third tier consists of the amount of any distributions in excess of accumulated earnings and profits.  Such excess will be taxable as capital gain to the shareholder.

If NewCo does not have accumulated earnings and profits, however, the distribution will be applied against and will reduce the NewCo shareholder's adjusted stock basis (on a dollar-for-dollar basis) in respect of its NewCo shares as to which the distribution was made, but not below zero, and any remaining excess will be treated as gain from the sale or exchange of NewCo shares.  As indicated above, suspended losses may be carried forward and taken into account by a shareholder when it has an increase in its NewCo stock basis, subject to certain limitations.

**Each shareholder of NORDAM Parent is urged to consult its tax advisors with respect to the tax consequences of the NewCo Cash Payment.**

B.      *Ownership and Disposition of New Units*

Under the Treasury Regulations, a domestic business entity that has two or more owners and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as an association taxable as a corporation.  The making of such an election is prohibited by the New LLC Agreement.  Thus, assuming, as discussed in the following paragraph, that NORDAM Parent will not be treated as a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes, NORDAM Parent will be treated as a partnership for U.S. federal income tax purposes following the New Money Investment.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  The New LLC Agreement restricts the transfer of units in NORDAM Parent if such transfer would jeopardize the status of NORDAM Parent as a partnership for U.S. federal income tax purposes.   The remainder of this discussion assumes that NORDAM Parent will be treated as a partnership for U.S. federal income tax purposes following the New Money Investment.

As a partnership, NORDAM Parent itself will generally not be subject to U.S. federal income tax.  Instead, NORDAM Parent will file an annual partnership information return with the IRS, which form will report the results of NORDAM Parent's operations.  NewCo will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of NORDAM Parent's income, gain, loss, deduction and credit for

the taxable year of NORDAM Parent ending with or within its taxable year. Each item generally will have the same character as if the member had realized the item directly. NewCo will be required to report these items regardless of the extent to which, or whether, it receives cash distributions from NORDAM Parent for such taxable year, and thus may incur income tax liabilities in excess of any distributions from NORDAM Parent.

NewCo will be allowed to deduct its allocable share of NORDAM Parent's losses (if any) only to the extent of its adjusted tax basis (discussed below) in its partnership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit NewCo's ability to deduct its allocable share of deductions and losses of NORDAM Parent against other income.

NORDAM Parent will provide NewCo with the necessary information to report its allocable share of NORDAM Parent's tax items for U.S. federal income tax purposes; however, no assurance can be given that NORDAM Parent will be able to provide such information before the initial due date of NewCo's U.S. federal income tax return and NewCo may therefore be required to apply to the IRS for an extension of time to file its tax returns.

NewCo must treat items on its own tax returns consistently with how such items will be reported on any U.S. federal income tax returns of NORDAM Parent, unless it files a statement with the IRS disclosing the inconsistency.

In the event that the income tax returns of NORDAM Parent are audited by the IRS, and in accordance with the New LLC Agreement, NORDAM Parent will use commercially reasonable efforts to make a timely and valid election to cause the income and deductions of NORDAM Parent to be determined at the level of its members rather than in a single proceeding at the NORDAM Parent level. If, however, such items are determined at the NORDAM Parent level in a single proceeding, the "partnership representative" (NewCo) will have considerable authority under the Tax Code and the New LLC Agreement to make decisions affecting the tax treatment and procedural rights of all members.

NewCo generally will not recognize gain or loss on the receipt of a distribution of cash or property from NORDAM Parent (provided that NewCo is not treated as exchanging its share of NORDAM Parent's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together, **Ordinary Income Items**") for other partnership property). NewCo, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from NORDAM Parent (including any constructive distribution of money resulting from a reduction of NewCo's share of the indebtedness of NORDAM Parent) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds NewCo's adjusted tax basis in its partnership interest. Such distribution would be treated as gain from the sale or exchange of a partnership interest, which is described below.

NewCo will recognize gain on the complete liquidation of its partnership interest in NORDAM Parent only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by NewCo on the receipt of a

distribution from NORDAM Parent generally will be capital gain, but may be taxable as ordinary income under certain circumstances.  No loss can be recognized on a distribution in liquidation of a partnership interest, unless NewCo receives no property other than money and Ordinary Income Items.

NewCo's adjusted tax basis in its partnership interest in NORDAM Parent generally will be equal to its initial tax basis (discussed above), increased by the sum of (1) any additional capital contribution it makes to NORDAM Parent, (2) its allocable share of the income of NORDAM Parent, and (3) increases in its allocable share of the indebtedness of NORDAM Parent, and reduced, but not below zero, by the sum of (4) its allocable share of the losses of NORDAM Parent, and (5) the amount of money or the adjusted tax basis of property distributed to it, including constructive distributions of money resulting from reductions in its allocable share of the indebtedness of NORDAM Parent.

A taxable sale of all or part of NewCo's partnership interest in NORDAM Parent will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and NewCo's adjusted tax basis for the portion of the interest disposed of.  Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent the proceeds of the sale are attributable to NewCo's allocable share of Ordinary Income Items of NORDAM Parent and such proceeds exceed NewCo's adjusted tax basis attributable to such Ordinary Income Items.  NewCo's ability to deduct any loss recognized on the sale of its partnership interest will depend on the NewCo's own circumstances and may be restricted under the Tax Code.

As an S corporation, NewCo is not itself subject to U.S. federal income tax.  Instead, each shareholder of NewCo is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction, and credit of NewCo.  Accordingly, the foregoing U.S. federal income tax consequences of the ownership and disposition of New Units generally will not be borne by NewCo, but instead will be borne by the shareholders of NewCo.  **If you are a shareholder of NORDAM Parent, you are urged to consult your tax advisor.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# VIII.
# CONFIRMATION OF PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by Class 7 under the Plan or, if rejected by Class 7, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Class 7; (B) in the "best interests" of the holders of Interests in Class 7; and (C) feasible.

A.      *Acceptance of Plan by Impaired Class*

Under the Plan, only Class 7 holders of Existing NORDAM Parent Interests are impaired, therefore only Class 7 is entitled to vote on the Plan.  The Bankruptcy Code defines "acceptance" of a plan by a class of Interests as acceptance by interest holders in that Class that hold at least two-thirds in amount of the Interests that actually cast ballots for acceptance or rejection of the Plan.  Holders of Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If Class 7 does not vote in sufficient numbers to accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to Class 7, the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that the Plan is fair and equitable and does not discriminate unfairly with respect to Class 7.  **If Class 7 rejects the Plan and all other confirmation requirements are otherwise satisfied at the Combined Hearing, the Debtors will ask the Bankruptcy Court to rule that the Plan may be confirmed on the grounds that the section 1129(b) requirements set forth below have been satisfied as established by the Debtors at the Combined Hearing.**

B.      *Best Interests Test*

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interests" test.  As will be established by the Debtors at the Combined Hearing, the Debtors believe that the value of any distributions to holders of Allowed Interests in Class 7 under the Plan exceeds the value of distributions that would be received in a hypothetical chapter 7 case.

C.      *Feasibility*

As will be established by the Debtors at the Combined Hearing, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors prepared an unaudited projected consolidated statement of operations for the five-year period January 1, 2019 through

December 31, 2023 (the "**Financial Projections**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit B**. The Financial Projections incorporate all estimated payments that are required pursuant to the Plan and, therefore, based upon such projections, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

D.      *Combined Hearing and Objections*

The Combined Hearing to consider final approval of this Disclosure Statement and confirmation of the Plan is scheduled for January 30, 2019 at 11:30 a.m. (Eastern Time).  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court pursuant to a notice filed on the docket for these chapter 11 cases.

Any objection to approval of this Disclosure Statement or confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, must set forth the name of the objector, the basis for the objection and the specific grounds for the objection, and must be filed with the Bankruptcy Court and served upon all of the below parties.

**Debtors:**          The NORDAM Group, Inc.
6910 North Whirlpool Drive
Tulsa, Oklahoma 74117
Attn.: Meredith Siegfried Madden and John C.
DiDonato
E-mail: Meredith@nordam.com
            JDiDonato@huronconsultinggroup.com

with copies to:

Weil, Gotshal & Manges LLP             Richards, Layton & Finger, PA
767 Fifth Avenue                       920 North King Street
New York, New York 10153               Wilmington, Delaware 19801
Attn.: Ray C. Schrock, P.C.; Ryan Preston    Attn: Daniel J. DeFranceschi; Paul
Dahl; Jill Frizzley; and Daniel Gwen   Heath; Brett M. Haywood; and Megan
E-mail: Ray.Schrock@weil.com           E. Kenney
            Ryan.Dahl@weil.com         E-mail: DeFranceschi@rlf.com
            Jill.Frizzley@weil.com             Heath@rlf.com
            Daniel.Gwen@weil.com               Haywood@rlf.com
                                               Kenney@rlf.com

Al Givray, General Counsel
c/o The NORDAM Group, Inc.
6910 North Whirlpool Drive
Tulsa, Oklahoma 74117
E-mail: agivray@nordam.com

| **Counsel to the DIP Agent:** | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn: Elisha Graff; Nicholas Baker; and David Baruch<br>E-mail: egraff@stblaw.com<br> nbaker@stblaw.com<br> david.baruch@stblaw.com | Duane Morris LLP<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801<br>Attn: Michael Lastowski and Jarret Hitchings<br>E-mail: mlastowski@duanemorris.com<br> jphitchings@duanemorris.com |
| **Counsel to the Committee:** | Morrison & Foerster LLP<br>250 W. 55th St<br>New York, New York 10019<br>Attn: Lorenzo Marinuzzi; Jonathan I. Levine; and Todd Goren<br>E-mail: lmarinuzzi@mofo.com<br> jonlevine@mofo.com<br> tgoren@mofo.com | Cole Schotz P.C.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Attn: Norman L. Pernick and J. Kate Stickles<br>E-mail: npernick@coleschotz.com<br> kstickles@coleschotz.com |

> **UNLESS AN OBJECTION IS TIMELY SERVED AND FILED,**
> **IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## IX.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Interests in Class 7 to vote in favor thereof.


Dated: January 3, 2019
      Wilmington, Delaware

                Respectfully submitted,

                The NORDAM Group, Inc.
                Nacelle Manufacturing 1 LLC
                Nacelle Manufacturing 23 LLC
                PartPilot LLC
                TNG DISC, Inc.


                */s/ John C. DiDonato*
                Name: John C. DiDonato
                Title: Chief Restructuring Officer

## Exhibit A

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                             :

In re                         :          **Chapter 11**
                             :

**THE NORDAM GROUP, INC.**, *et al.*,   :          **Case No. 18-11699 (MFW)**
                             :

                  Debtors.[1]   :          **(Jointly Administered)**
                             :

-------------------------------------------------------------x

**FIRST AMENDED JOINT POSTPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION OF**
**THE NORDAM GROUP, INC. AND ITS DEBTOR AFFILIATES**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Jill Frizzley (admitted *pro hac vice*)
Daniel Gwen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul Heath (No. 3704)
Brett M. Haywood (No. 6166)
Megan E. Kenney (No. 6426)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated: January 3, 2019

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are The NORDAM Group, Inc. (7803); Nacelle Manufacturing 1 LLC (3107); Nacelle Manufacturing 23 LLC (5528); PartPilot LLC (5261); and TNG DISC, Inc. (9726).  The Debtors' corporate headquarters and service address is 6910 North Whirlpool Drive, Tulsa, Oklahoma 74117.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, AND GOVERNING LAW ............................................................................. 1
    A.    Defined Terms .............................................................................................. 1
    B.    Rules of Interpretation .............................................................................. 10
    C.    Computation of Time ................................................................................. 11
    D.    Governing Law .......................................................................................... 11
    E.    Controlling Document ............................................................................... 11

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ............................... 11
    A.    Administrative Claims ............................................................................... 11
    B.    DIP Claims ................................................................................................. 12
    C.    Professional Fee Claims ............................................................................ 12
    D.    Priority Tax Claims .................................................................................... 13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 13
    A.    Summary of Classification ......................................................................... 13
    B.    Treatment of Claims and Interests ............................................................ 14
    C.    Special Provision Governing Unimpaired Claims ..................................... 17
    D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .............. 17
    E.    Presumed Acceptance by Class 7 If No Votes Received ........................... 18
    F.    Elimination of Vacant Classes .................................................................. 18

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................... 18
    A.    No Substantive Consolidation ................................................................... 18
    B.    General Authorization ............................................................................... 18
    C.    Sources of Consideration for Plan Distributions ....................................... 19
    D.    New Money Investment ............................................................................. 19
    E.    Issuance and Distribution of NewCo Common Stock ............................... 19
    F.    Tax-Free Reorganization ........................................................................... 19
    G.    Corporate Existence .................................................................................. 20
    H.    Exit Facilities ............................................................................................ 21
    I.    Vesting of Assets in Reorganized Debtors ............................................... 21
    J.    Exemption from Certain Taxes and Fees .................................................. 21
    K.    Preservation of Causes of Action .............................................................. 21
    L.    Continuation of Insurance Policies ........................................................... 22
    M.    Continuation of Workers' Compensation Programs .................................. 22
    N.    Assumption and Continuation of Gulfstream APA .................................. 23
    O.    Restructuring Expenses ............................................................................. 23

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 23
    A.    Assumption, Assignment, and Rejection of Executory Contracts and Unexpired
Leases ........................................................................................................ 23
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ......... 24
    C.    Assumption or Assignment Notices and Objections to Assumption or
Assignment of Executory Contracts and Unexpired Leases ...................... 24
    D.    Dispute Resolution .................................................................................... 24
    E.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired
Leases ........................................................................................................ 25
    F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ......... 25

G.    Indemnification Obligations ........................................................................................ 25

H.    Reservation of Rights................................................................................................. 26

I.    Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ................... 26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................. 26

A.    Timing and Calculation of Amounts to Be Distributed .................................... 26

B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................... 27

C.    Compliance with Tax Requirements.................................................................... 28

D.    Allocations ....................................................................................................... 28

E.    Setoffs and Recoupment ................................................................................... 28

F.    Claims Paid by Third Parties ........................................................................... 28

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND

    DISPUTED CLAIMS ................................................................................... 29

A.    Claim Allowance Process ............................................................................... 29

B.    Claims and Interests Administration Responsibilities ...................................... 29

C.    Distributions After Allowance ......................................................................... 30

D.    Reservation of Rights....................................................................................... 30

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............ 30

A.    Compromise and Settlement of Claims, Interests, and Controversies .............. 30

B.    Discharge of Claims.......................................................................................... 30

C.    Releases by Debtors ......................................................................................... 31

D.    Releases by Holders of Claims and Interests .................................................. 31

E.    Exculpation ...................................................................................................... 33

F.    Injunction ........................................................................................................ 33

G.    Retention of Causes of Action ......................................................................... 34

H.    Subordination Rights ....................................................................................... 34

I.    Release of Liens .............................................................................................. 34

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........................ 35

A.    Conditions Precedent to Effective Date ............................................................ 35

B.    Waiver of Conditions....................................................................................... 35

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN............................ 36

A.    Modification and Amendments......................................................................... 36

B.    Effect of Confirmation on Modifications ......................................................... 36

C.    Revocation or Withdrawal of the Plan.............................................................. 36

ARTICLE XI. RETENTION OF JURISDICTION ................................................................. 36

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................... 39

A.    Immediate Binding Effect................................................................................ 39

B.    Payment of Statutory Fees ............................................................................... 39

C.    Successors and Assigns ................................................................................... 39

D.    Service of Documents...................................................................................... 39

E.    Term of Injunctions or Stays............................................................................ 40

F.    Entire Agreement............................................................................................. 40

G.    Nonseverability of Plan Provisions.................................................................. 41

H.    Dissolution of Committee ................................................................................ 41

I.    Expedited Tax Consideration............................................................................ 41

J.    Reservation of Rights in Favor of Governmental Units ................................... 42

## INTRODUCTION

The NORDAM Group, Inc., Nacelle Manufacturing 1 LLC, Nacelle Manufacturing 23 LLC, PartPilot LLC, and TNG DISC, Inc. (each, a "**Debtor**" and, collectively, the "**Debtors**") each propose this first amended joint postpackaged chapter 11 plan of reorganization (the "**Plan**") pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in Article I.A. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, projections of future operations, and a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims against and Interests in the Debtors set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors; (b) the Professional Fee Claims; (c) the DIP Claims; and (d) all fees and charges assessed against the estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code.

2.    "*Allowed*" means, with reference to any Claim or Interest, a Claim against or Interest in any Debtor: (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors; (c) as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof is determined by a Final Order of a court of competent jurisdiction; (d) expressly allowed under the Plan; (e) that is not listed as unliquidated, contingent, or disputed in the Schedules; or (f) that is not disputed by, or subject to reconciliation with, any of the Debtors or Reorganized Debtors in accordance with applicable nonbankruptcy law or contract; *provided*, that notwithstanding the foregoing, (x) unless expressly waived by the

1

Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims and Interests that are Reinstated or otherwise unimpaired pursuant to the Plan.

3.    "*Amended Organizational Documents*" means the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws for the Reorganized Debtors, including the New LLC Agreement.

4.    "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time and applicable to these chapter 11 cases.

5.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over these chapter 11 cases, and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over these chapter 11 cases under section 151 of title 28 of the United States Code.

6.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the local rules of the Bankruptcy Court, each as applicable to these chapter 11 cases.

7.    "*Business Day*" means any day, other than a Saturday, Sunday, "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

8.    "*Cash*" means the legal tender of the United States of America.

9.    "*Cause of Action*" means any action, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 of the Bankruptcy Code; (d) any Claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer Claim.

10.    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

11.    "*Class*" means any group of Claims or Interests classified as set forth in <u>Article III</u> pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

12.     "*Class 7 Cash Payment*" means Cash in an amount to be determined by the Debtors and New Investor and disclosed in the Investment Agreement or otherwise disclosed in the Plan Supplement, and that will be (a) paid from Reorganized NORDAM Parent to NewCo and then (b) paid from NewCo to holders of Allowed Existing NORDAM Parent Interests in accordance with Article III.B.7 and the Plan.

13.     "*Committee*" means the statutory committee of unsecured creditors appointed by the U.S. Trustee in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

14.     "*Confirmation Date*" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

15.     "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan, as such hearing may be adjourned, reconvened, or continued from time to time.

16.     "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement on a final basis and confirming the Plan, which order shall be in form and substance reasonably acceptable to (a) the Prepetition Agent, the DIP Agent, and the "Required Lenders" (as defined in the DIP Credit Agreement), in each case solely with respect to any provisions that affect their Claims or rights, (b) NewCo, solely with respect to any provisions that affect its Claims or rights, and (c) New Investor, solely with respect to any provisions that affect its rights or obligations under the Investment Agreement.

17.     "*Cure Amount*" means the payment of Cash by the Debtors or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary, to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume or assign such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

18.     "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, including any successor thereto.

19.     "*DIP Claim*" means any Claim against any Debtor arising from, or related to, the DIP Documents, and any other Claims of the DIP Agent or DIP Lenders arising under the DIP Order.

20.     "*DIP Credit Agreement*" means the *Senior Secured, Super Priority Debtor-in-Possession Credit Agreement*, dated July 25, 2018, between NORDAM Parent as borrower, the DIP Agent, and the DIP Lenders and as approved by the Bankruptcy Court pursuant to the DIP Order, as amended, supplemented, restated, or otherwise modified from time to time.

21.     "*DIP Documents*" means collectively, the DIP Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (including any guarantee agreements and collateral documentation), in each case, as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof.

22.    "*DIP Lenders*" means the lenders under the DIP Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the DIP Credit Agreement.

23.    "*DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, and (II) Granting Related Relief* (ECF No. 217), as the same has been supplemented, including by the order of the Bankruptcy Court dated September 6, 2018 (ECF No. 278).

24.    "*Disallowed*" means, with respect to any Claim or Interest, that such Claim or Interest is not Allowed.

25.    "*Disclosure Statement*" means the *Disclosure Statement for First Amended Joint Postpackaged Chapter 11 Plan of Reorganization of The NORDAM Group, Inc. and its Debtor Affiliates*, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

26.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

27.    "*Effective Date*" means the Business Day on which all conditions to the effectiveness of the Plan set forth in **Error! Reference source not found.** have been satisfied or waived in accordance with the terms of the Plan.

28.    "*Exculpated Parties*" means each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors, (b) the Committee and each of its members, and (c) with respect to each of the foregoing entities in clauses (a) and (b), all Related Parties.

29.    "*Existing NORDAM Parent Interests*" means all Interests in NORDAM Parent immediately before the Merger.

30.    "*Exit Facilities*" means the senior secured credit facilities in a principal amount of up to $100 million in the form of an asset-based revolving credit facility and up to $240 million in the form of a term loan facility, on terms acceptable to the Debtors and as otherwise provided for in the Exit Facility Documents.

31.    "*Exit Facility Agents*" means the administrative agents and collateral agents under the Exit Facility Credit Agreements, their successors, assigns, or any replacement agents appointed pursuant to the terms of the Exit Facility Documents.

32.    "*Exit Facility Credit Agreements*" means the credit agreements to be entered into in connection with the Exit Facilities (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be acceptable to the Debtors.

33.    "*Exit Facility Documents*" means the Exit Facility Credit Agreements and such other financing documents to be entered into in connection with the Exit Facilities (including any

guarantee agreements, pledge and collateral agreements, and other security documents), which shall be acceptable to the Debtors.

34.     "*Exit Facility Lenders*" means the lenders under the Exit Facility Credit Agreements and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Exit Facility Credit Agreements.

35.     "*Final Order*" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which: (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

36.     "*General Unsecured Claim*" means any prepetition unsecured Claim against any Debtor that is: (a) not an Administrative Claim, Priority Tax Claim, Priority Non-Tax Claim, or Intercompany Claim; or (b) determined by the Bankruptcy Court to be a prepetition general unsecured claim that is not entitled to priority or subject to subordination.  For the avoidance of doubt, any unpaid Purchase Orders (as defined in the Gulfstream APA and listed on Schedule 2.2(a)(i) therein) shall constitute General Unsecured Claims and be treated in accordance with Article III.B.4 and the Plan.

37.     "*Gulfstream*" means Gulfstream Aerospace Corporation.

38.     "*Gulfstream APA*" means the *Asset Purchase Agreement* dated September 1, 2018 (and all schedules, exhibits, instruments, and other documents in connection therewith) between NORDAM Parent as seller, Gulfstream Aerospace Corporation as buyer, and Gulfstream Aerospace Corporation as guarantor (as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof).

39.     "*Gulfstream Sale Order*" means the *Order (I) Authorizing and Approving (A) Global Resolution Between Debtors and Gulfstream Aerospace Corporation, (B) Rejection of the LTPA, and (C) Entry into Asset Purchase Agreement With Gulfstream Aerospace Corporation and Transactions Contemplated Thereunder, and (II) Related Relief* entered by the Bankruptcy Court on September 26, 2018 (ECF No. 362).

40.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or an affiliate of a Debtor, arising before or after the Petition Date.

41.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor, other than Existing NORDAM Parent Interests.

42.     "*Interests*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) that existed immediately before the Effective Date, including any common stock, limited liability company interest, equity, ownership, profit interests, unit, or share in any Debtor, whether fully vested or vesting in the future (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

43.     "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and (II) Granting Related Relief* (ECF No. 194).

44.     "*Investment Agreement*" means the investment agreement providing for a Cash investment by New Investor in exchange for New Units, which will be filed as part of the Plan Supplement and approved pursuant to the Confirmation Order.

45.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

46.     "*Merger*" has the meaning set forth in <u>Article IV.F.</u>

47.     "*Merger Sub*" means a newly-formed Delaware limited liability company formed by NewCo, to be named before the Effective Date.

48.     "*NewCo*" means a newly-formed Delaware corporation formed by NORDAM Parent, to be named before the Effective Date, which before the Merger shall own 100% of the units of Merger Sub, and which after the Merger shall own New Units of NORDAM Parent in accordance with the Tax-Free Reorganization, and which New Units will be subject to dilution by the New Money Investment and any post-Effective Date issuances authorized by the New LLC Agreement.

49.     "*NewCo Common Stock*" means the common stock of NewCo to be issued as part of the Tax-Free Reorganization in accordance with the Plan.

50.     "*NewCo Organizational Documents*" means the organizational documents for NewCo, including a charter for NewCo that incorporates and adopts the *Preincorporation Subscription Agreement* dated March 27, 1977 and the restrictions on transfer and ownership set forth therein, which organizational documents shall be substantially in the form filed as part of the Plan Supplement.

51.     "*New Investor*" means the "Purchaser" as defined in the Investment Agreement and identified in the Plan Supplement.

52.     "*New LLC Agreement*" means the limited liability company agreement for NORDAM Parent after the NORDAM Parent Conversion, which shall be substantially in the form filed as part of the Plan Supplement.

53.     "*New Money Investment*" means the investment contemplated by the Investment Agreement for New Units to be issued to the New Investor in accordance with the Investment Agreement on the Effective Date.

54.     "*New Units*" means units of NORDAM Parent owned by NewCo in accordance with the Tax-Free Reorganization and also the units issued to New Investor after the NORDAM Parent Conversion in accordance with the Plan and the Investment Agreement.

55.     "*NORDAM Parent*" means, before the NORDAM Parent Conversion, The NORDAM Group, Inc. and, after the NORDAM Parent Conversion, the successor limited liability company to The NORDAM Group, Inc., to be named before the Effective Date.

56.     "*NORDAM Parent Conversion*" has the meaning set forth in Article IV.F.

57.     "*Other Secured Claim*" means any secured Claim against any Debtor, other than a Prepetition Credit Facility Claim or DIP Claim.

58.     "*Petition Date*" means July 22, 2018, the date on which the Debtors commenced their chapter 11 cases.

59.     "*Plan*" means this joint postpackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

60.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance materially consistent with the Plan, to be filed using the Debtors' commercially reasonable efforts at least seven days before the Voting Deadline, consisting of: (a) the New LLC Agreement; (b) the NewCo Organizational Documents; (c) any other Amended Organizational Documents (only if such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); (d) a term sheet or other documentation setting forth the material terms of the Exit Facilities; (e) the Investment Agreement; (f) if known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (g) the Schedule of Assigned GAC Contracts; and (h) the Schedule of Rejected Contracts, if any.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (h), as applicable.

61.     "*Postpetition GUC Interest*" means, with respect to any Allowed General Unsecured Claim, interest accruing at such rate as may be agreed by between the Debtors or Reorganized Debtors and the holder of such Allowed General Unsecured Claim or such other rate as may be ordered by the Bankruptcy Court, in each case for the period of the Petition Date through the date of payment.

62.    "*Prepetition Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement and the other Prepetition Credit Documents, including any successor thereto.

63.    "*Prepetition Credit Agreement*" means the *Fourth Amended and Restated Credit Agreement*, dated December 18, 2012, between NORDAM Parent as borrower, the Prepetition Agent, and the Prepetition Lenders, as amended, supplemented, restated, or otherwise modified as of the Petition Date.

64.    "*Prepetition Credit Documents*" means, collectively, the Prepetition Credit Agreement and all "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (including any guarantee agreements and collateral documentation), in each case, as amended, restated, modified, or supplemented as of the Petition Date.

65.    "*Prepetition Credit Facility Claim*" means any Claim against any Debtor arising under or related to the Prepetition Credit Documents.

66.    "*Prepetition Lenders*" means the lenders under the Prepetition Credit Agreement.

67.    "*Prepetition Secured Parties*" means the Prepetition Agent, the Prepetition Lenders, and the other "Secured Parties" as defined in the Prepetition Credit Agreement.

68.    "*Priority Non-Tax Claim*" means any Claim against any Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

69.    "*Priority Tax Claim*" means any Claim of a governmental unit against any Debtor entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

70.    "*Professional*" means an Entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services provided before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or otherwise, or (b) seeking compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

71.    "*Professional Fee Claim*" means any Claim against any Debtor for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  For the avoidance of doubt, Restructuring Expenses will not constitute Professional Fee Claims.

72.    "*Professional Fee Escrow Account*" means an interest-bearing account holding an amount equal to the total amount of Professional Fee Claims estimated in accordance with <u>Article II.C</u> and funded by the Debtors in Cash on or before the Effective Date.

73.     "*Reinstated*" or "*Reinstatement*" means leaving a Claim unimpaired under the Plan pursuant to section 1124(a)(2) of the Bankruptcy Code.

74.     "*Related Parties*" means with respect to any Released Party or any Exculpated Party, an Entity's predecessors, successors and assigns, parents, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders (and any fund managers, fiduciaries or other agents of shareholders with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, each in their capacities as such.

75.     "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Prepetition Secured Parties; (d) the DIP Agent; (e) the DIP Lenders; (f) the Exit Facility Agents; (g) the Exit Facility Lenders; (h) the Committee and each of its members; (i) the New Investor; and (j) with respect to each of the foregoing entities in clauses (a) through (i), all Related Parties; *provided that* a holder of a Claim or Interest that objects to or opts-out of the releases set forth in Article VIII.D shall not be a "Released Party."

76.     "*Reorganized Debtors*" means each of the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

77.     "*Restructuring Expenses*" means any reasonable and documented fees and expenses incurred in connection with these chapter 11 cases by the advisors to the DIP Agent, DIP Lenders, Prepetition Agent, and Prepetition Lenders (including Simpson Thacher & Bartlett LLP and Winstead PC, as counsel to the DIP Agent; CR3 Partners LLC, as financial advisor to the DIP Agent; Duane Morris LLP, as local counsel to the DIP Agent; and any other advisors or professionals retained by any of the DIP Lenders), that are due and owing after receipt of applicable invoices, and in accordance with the terms of the DIP Order, the DIP Documents, the Prepetition Credit Documents, or their applicable agreements or engagement letters.

78.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code (ECF Nos. 323–34) and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time (ECF Nos. 755–60).

79.     "*Schedule of Assigned GAC Contracts*" means the schedule of any executory contracts and unexpired leases to be assigned to Gulfstream pursuant to the Plan, and filed as part of the Plan Supplement.

80.     "*Schedule of Rejected Contracts*" means the schedule of any executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, and filed as part of the Plan Supplement.

81.     "*Solicitation Order*" means the *Order (I) Conditionally Approving Disclosure Statement; (II) Scheduling Combined Hearing to Approve Disclosure Statement and Confirm Postpackaged Chapter 11 Plan; (III) Approving Solicitation Procedures; and (IV) Granting Related Relief*, dated January 3, 2019 (ECF No. 838), by which, among other things, the Bankruptcy Court conditionally approved the Disclosure Statement pursuant to the Bankruptcy Code and authorized the Debtors' solicitation procedures for the Plan, as set forth therein.

82.     "*Tax-Free Reorganization*" shall have the meaning set forth in Article IV.F.

83.     "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

84.     "*Voting Deadline*" means the date set by the Bankruptcy Court by which all completed ballots must be received.

B.     *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (4) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any docket number references in the Plan shall refer to the docket number of any document filed with the Bankruptcy Court in these chapter 11 cases; (11) references to "proofs of Claim," "holders of Claims," "Disallowed Claims," and the like shall include "proofs of Interest," "holders of Interests," "Disallowed Interests," and the like as applicable; (12) references to "shareholders," "directors" or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (13) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any

other Entity; and (14) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

E.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order on one hand, and the Plan, the Disclosure Statement, or the Plan Supplement on the other hand, the Confirmation Order shall control (other than with respect to Article XII.J, which shall control over the Confirmation Order, the Disclosure Statement, and the Plan Supplement).

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

Except if a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim (other than a DIP Claim or a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable, the later of (1) the Effective Date and (2) the first Business Day after the date that is 10 calendar days after the date such Administrative Claim becomes an Allowed Administrative Claim unless otherwise required by a Final Order; *provided*, that Allowed Administrative Claims (other than a DIP

11

Claim or a Professional Fee Claim) representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Reorganized Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

B.    *DIP Claims*

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, (1) all "Obligations" (as such term is defined in the DIP Credit Agreement), including any accrued and unpaid interest thereon and additional amounts, charges, fees, and expenses due under the DIP Documents, shall be paid in full in Cash, (2) the DIP Documents shall be cancelled, and (3) the parties' obligations thereunder shall be terminated; *provided that* any indemnification and reimbursement obligations under the DIP Documents shall survive any cancellation, conversion, or discharge under the Plan in accordance with its terms, and any rights that the DIP Agent may have under the agency provisions of the DIP Credit Agreement shall survive any such cancellation or discharge, as further described in Article V.G below.  Notwithstanding anything in this Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the DIP Documents shall continue in full force and effect and shall not be released until all Allowed DIP Claims have been paid in full in Cash.

C.    *Professional Fee Claims*

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court no later than the first Business Day that is 60 days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five Business Days before the Effective Date; *provided, that* such estimate shall not be deemed to limit any each Professional's respective Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the estimated Professional Fee Claims, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow Account in any way (including the Exit Facility).  The Professional Fee Escrow Account and funds therein (1) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (2) shall be held in trust for the Professionals; *provided that* funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.   Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court; *provided that* the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow Account.

If the amount of funds in the Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow Account from the Debtors' Estates without any further action or order of the Bankruptcy Court.

On the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and consummation of the Plan incurred by the Debtors and the Reorganized Debtors, as applicable. On the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Priority Tax Claims*

Except if a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors or Reorganized Debtors, as applicable, treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

Claims against and Interests in the Debtors, except for Administrative Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only if the Claim or Interest qualifies within the description of that Class and is classified in other Classes if any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only if such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

The classification of Claims against and Interests in each Debtor is set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests shall apply separately to each of the Debtors.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Prepetition Credit Facility Claims | Unimpaired | No (presumed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (presumed to accept) |
| 5 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 6 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 7 | Existing NORDAM Parent Interests | Impaired | Yes |

B.     *Treatment of Claims and Interests*

1.     <u>Class 1 – Priority Non-Tax Claims</u>

a.     *Classification*:  Class 1 consists of Priority Non-Tax Claims.

b.     *Treatment*:  Except if a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors:

(i)     each holder shall receive payment in Cash in an amount equal to such holder's Allowed Priority Non-Tax Claim payable on the Effective Date (or, if payment is not then due, payment in the ordinary course of business); or

(ii)     such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.     *Voting*:  Class 1 is unimpaired and the holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Allowed Priority Non-Tax Claims.

2.     <u>Class 2 – Other Secured Claims</u>

a.     *Classification*:  Class 2 consists of Other Secured Claims.

b.     *Treatment*:  Except if a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Other Secured Claim, at the option of the Debtors:

(i)     each holder shall receive payment in Cash in an amount equal to such holder's Allowed Other Secured Claim payable on the

Effective Date (or, if payment is not then due, payment in the ordinary course of business);

(ii)   the applicable Debtor's interest in the collateral securing the Allowed Other Secured Claim shall be returned; or

(iii)   such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.   *Voting*:  Class 2 is unimpaired and the holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Allowed Other Secured Claims.

3.   <u>Class 3 – Prepetition Credit Facility Claims</u>

a.   *Classification*:  Class 3 consists of Prepetition Credit Facility Claims, which shall be deemed Allowed in the amount of $266,521,739.11 with respect to principal, plus such amounts as may be owing for any outstanding "Obligations" (as such term is defined in the Prepetition Credit Agreement) thereunder, including any accrued and unpaid interest thereon as of the Effective Date and additional amounts, charges, fees, and expenses due under the Prepetition Credit Documents.

b.   *Treatment*:  Except if a holder of an Allowed Prepetition Credit Facility Claim agrees to less favorable treatment, on the Effective Date: (i) each holder of an Allowed Prepetition Credit Facility Claim shall receive payment in full in Cash, (ii) the Prepetition Credit Documents shall be cancelled, and (iii) the parties' obligations under the Prepetition Credit Documents shall be terminated; *provided that* any indemnification and reimbursement provisions under the Prepetition Credit Agreement shall survive any cancellation, conversion, or discharge under the Plan in accordance with its terms, and any rights that the Prepetition Agent may have under the agency provisions of the Prepetition Credit Agreement shall survive any such cancellation or discharge, as further described in <u>Article V.G</u> below.  Notwithstanding anything in this Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the Prepetition Credit Documents shall continue in full force and effect and shall not be released until all Allowed Prepetition Credit Facility Claims have been paid in full in Cash.

c.   *Voting*:  Class 3 is unimpaired and the holders of Prepetition Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of

Prepetition Credit Facility Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Prepetition Credit Facility Claims.

4.  <u>Class 4 – General Unsecured Claims</u>

a.  *Classification*:  Class 4 consists of General Unsecured Claims.

b.  *Treatment*:  Except if a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim or has been paid before the Effective Date, at the option of the Debtors:

(i)  the Debtors or Reorganized Debtors will (A) on the Effective Date, pay in full and in Cash any Allowed General Unsecured Claim that has become due and payable as of the Effective Date, including Postpetition GUC Interest if requested by the holder of such Claim, and (B) otherwise continue to pay or treat Allowed General Unsecured Claims in the ordinary course of business that have not yet become due and payable as of the Effective Date, as if these chapter 11 cases had not been commenced; or

(ii)  such holder will receive such other treatment so as to render such holder's Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

*provided*, that in either case the Debtors reserve all defenses and rights with respect to the validity or amount of such General Unsecured Claims.

c.  *Voting*:  Class 4 is unimpaired and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Allowed General Unsecured Claims.

5.  <u>Class 5 – Intercompany Claims</u>

a.  *Classification*:  Class 5 consists of Intercompany Claims.

b.  *Treatment*:  On or after the Effective Date, all Allowed Intercompany Claims will be paid, adjusted, continued, settled, Reinstated, discharged, or eliminated as determined by the Debtors or Reorganized Debtors, as applicable, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors in their discretion.

c.  *Voting*:  Class 5 is unimpaired, and the holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed

Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Allowed Intercompany Claims.

6.      Class 6 – Intercompany Interests

    a.      *Classification*:  Class 6 consists of Intercompany Interests.

    b.      *Treatment*:  On or after the Effective Date, all Allowed Intercompany Interests will be paid, adjusted, continued, settled, Reinstated, discharged, or eliminated as determined by the Debtors or Reorganized Debtors, as applicable, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors in their discretion.

    c.      *Voting*:  Class 6 is unimpaired, and the holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Allowed Intercompany Interests.

7.      Class 7 – Existing NORDAM Parent Interests

    a.      *Classification*:  Class 7 consists of Existing NORDAM Parent Interests.

    b.      *Treatment*:  On the Effective Date, each Allowed Existing NORDAM Parent Interest will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each such Interest, its pro rata share of (i) 100% of the NewCo Common Stock and (ii) the Class 7 Cash Payment.

    c.      *Voting*:  Class 7 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Claim or Interest that is not "impaired" (within the meaning of section 1124 of the Bankruptcy Code), including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Claim or Interest.

D.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

If the Plan is not accepted by Class 7 with the requisite statutory majority under section 1125(c) of the Bankruptcy Code, the Debtors reserve the right to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Class.

E.     *Presumed Acceptance by Class 7 If No Votes Received*

If no holders of Interests eligible to vote in Class 7 vote to accept or reject the Plan, the Plan shall be presumed accepted by Class 7.

F.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *No Substantive Consolidation*

The Plan is proposed as a joint plan of reorganization of all of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of Claims against the Debtors.

B.     *General Authorization*

On the Confirmation Date, all actions necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan are deemed approved, and the Debtors and Reorganized Debtors may take all actions in furtherance of the Plan, including (1) executing and delivering appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Exit Facility Documents, the Investment Agreement, and the New LLC Agreement; (2) executing and delivering appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Exit Facility Documents, the Investment Agreement, and the New LLC Agreement; (3) filing appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; and (4) taking all other actions that the Debtors or Reorganized Debtors determine to be necessary, in each case without further notice to or order of the Bankruptcy Court or further act or action under applicable law, regulation, order, or rule, or the vote consent, authorization, or approval of any Entity.

Upon the Effective Date, all matters provided for in the Plan, the Exit Facility Documents, the Investment Agreement, or the New LLC Agreement involving the corporate structure of, and any corporate action required by, the Debtors or Reorganized Debtors shall be deemed to have occurred and shall be in effect, without any requirement of further action by any holders of Claims or Interests, directors, or officers of the Debtors or Reorganized Debtors.

The authorizations and approvals contemplated by this <u>Article IV.B</u> shall be effective notwithstanding any requirements under nonbankruptcy law.

C.    *Sources of Consideration for Plan Distributions*

Distributions under the Plan will be funded with: (1) Cash on hand; (2) Cash proceeds from the transactions contemplated by the Exit Facilities; (3) Cash proceeds from the New Money Investment; and (4) NewCo Common Stock.

On the Effective Date, the Debtors, Reorganized Debtors, and NewCo shall be authorized to pay the Class 7 Cash Payment in accordance with the Plan.

D.    *New Money Investment*

The transactions contemplated by the Investment Agreement and the New LLC Agreement, including issuance of the New Units, shall be authorized by entry of the Confirmation Order without the need for any further corporate action and without any further action by holders of Claims or Existing NORDAM Parent Interests.

E.    *Issuance and Distribution of NewCo Common Stock*

The issuance of NewCo Common Stock through the Plan and Tax-Free Reorganization shall be authorized by entry of the Confirmation Order without further action by holders of Claims or Existing NORDAM Parent Interests, and the NewCo Common Stock will be deemed duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the NewCo Common Stock under the Plan and the Tax-Free Reorganization shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

The NewCo Organizational Documents shall be binding on all Entities (and their respective successors and assigns) receiving or holding the NewCo Common Stock regardless of whether any such NewCo Common Stock are received or held on or after the Effective Date, in each case, pursuant to the Plan.  Any Entity receiving or holding NewCo Common Stock, as a condition thereof, shall be, and shall be deemed to be, bound by (1) the NewCo Organizational Documents and (2) the *Preincorporation Subscription Agreement* dated March 27, 1977 and the restrictions on transfer and ownership set forth therein, in both cases as may be amended or modified from time to time after the Effective Date in accordance with their terms.

F.    *Tax-Free Reorganization*

In connection with NORDAM Parent's intention to reorganize into a holding company structure, the following transactions shall occur in the following order before the New Money Investment by the New Investor, and the Debtors or Reorganized Debtors (as applicable) may take all actions necessary or appropriate to effectuate such transactions (collectively, the "**Tax-Free Reorganization**"):

1.      NORDAM Parent shall form NewCo, which in turn shall form Merger Sub.

2.      (a) NORDAM Parent shall merge with Merger Sub, with NORDAM Parent continuing as the surviving corporation (the "**Merger**"), (b) each Existing NORDAM Parent Interest issued and outstanding immediately before the Merger shall be converted into one share of NewCo Common Stock, which shall have the same designations, rights, powers and preferences, and the qualifications, limitations and restrictions thereof, as each Existing NORDAM Parent Interest converted in the Merger, subject to section 1123(a)(6) of the Bankruptcy Code and other applicable law, and each certificate representing an Existing NORDAM Parent Interest issued and outstanding immediately before the Merger shall, at the effective time of the Merger, be cancelled, and each holder thereof shall receive a certificate representing NewCo Common Stock into which the Existing NORDAM Parent Interest formerly represented by such certificate shall have been converted in the Merger, without the need for surrender or exchange thereof, and (c) the units of Merger Sub outstanding immediately before the Merger (which units, immediately before the Merger, will be held by NewCo) shall be converted into all of the issued and outstanding capital stock of NORDAM Parent, such that NORDAM Parent, upon the effectiveness of the Merger, shall become a wholly-owned subsidiary of NewCo.

3.      NORDAM Parent shall elect to be treated as a qualified subchapter S subsidiary for U.S. federal income tax purposes, as a result of which NewCo is intended to be treated as an S corporation for U.S. federal income tax purposes.  After such election, NORDAM Parent shall convert to a Delaware limited liability company (the "**NORDAM Parent Conversion**").

Subject to entry of the Confirmation Order, no vote of persons holding shares of NORDAM Parent immediately before the Tax-Free Reorganization shall be required to effect the Tax-Free Reorganization, and no such person shall have appraisal rights as a result of the Tax-Free Reorganization.   The NewCo Organizational Documents and the *Preincorporation Subscription Agreement* dated March 27, 1977, including the restrictions on transfer and ownership therein, shall apply to the shares of NewCo Common Stock and the holders thereof after the Tax-Free Reorganization as the NewCo Organizational Documents applied to the shares of NORDAM Parent and the holders thereof immediately before the Tax-Free Reorganization.

G.      *Corporate Existence*

On and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation or limited liability company, as the case may be, with all the powers of a corporation or limited liability company, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by or as contemplated by the Plan or otherwise, including pursuant to the Tax-Free Reorganization and the New Money Investment.  For purposes of the *Preincorporation Subscription Agreement* dated March 27, 1977 and only for such purpose, NewCo shall be, and shall be deemed to be, a

successor-in-interest and assign to NORDAM Parent, and the provisions of the *Preincorporation Subscription Agreement* dated March 27, 1977 shall continue to be binding upon NewCo and the holders of NewCo Common Stock, *mutatis mutandis*.

H.      *Exit Facilities*

On the Effective Date, (1) all of the Liens and security interests to be granted in accordance with the Exit Facility Documents shall be granted or deemed granted, (2) the Exit Facility Agents, on behalf of the Exit Facility Lenders, shall have valid, binding, perfected and enforceable Liens as specified therein, and (3) the Liens granted or deemed granted to secure the obligations arising thereunder shall be granted or deemed granted in good faith as an inducement to the Exit Facility Lenders to extend credit under the Exit Facilities and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens shall be as set forth in the Exit Facility Credit Agreements and their related documentation.

I.      *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each estate, all Causes of Action, all executory contracts and unexpired leases assumed or assigned by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

J.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the Plan Supplement shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

K.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to

commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to <u>Article VIII</u>. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors waive any and all Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation process pursuant to section 502(d) of the Bankruptcy Code or otherwise).

L.      *Continuation of Insurance Policies*

1.      <u>Director and Officer Liability Insurance</u>

All of the Debtors' unexpired director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as and deemed to be executory contracts under the Plan. On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired director and officer liability insurance policies and any agreements, documents, or instruments relating thereto with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date; *provided that* such director and officer liability insurance policies will go into runoff in accordance with their terms and the Reorganized Debtors may enter into new director and officer liability insurance policies in connection with the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing.

2.      <u>Continuation of Other Insurance Policies</u>

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of such unexpired insurance policies. Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed before the Effective Date.

M.      *Continuation of Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtors shall continue all obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation, and (c) workers' compensation insurance. All proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the

Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable nonbankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

N.    *Assumption and Continuation of Gulfstream APA*

As of the Effective Date, the Reorganized Debtors shall assume and continue all obligations under and related to the Gulfstream APA and such obligations shall not be discharged, impaired, or otherwise affected by the Plan.

O.    *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of these chapter 11 cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided, that* the Debtors and Reorganized Debtors (as applicable) shall have the right to review and object to any such Restructuring Expenses on reasonableness grounds.

All Restructuring Expenses to be paid on the Effective Date shall be estimated before and as of the Effective Date and such estimates shall be delivered to the Debtors at least two Business Days before the anticipated Effective Date; *provided, that* such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay Restructuring Expenses after the Effective Date when due and payable in the ordinary course related to implementation, consummation and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, and subject to payment of any Cure Amounts, all prepetition executory contracts and unexpired leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than the executory contracts or unexpired leases (1) identified on the Schedule of Assigned GAC Contracts, which shall be deemed assumed and assigned to Gulfstream on the Effective Date subject to payment of any Cure Amounts; (2) identified on the Schedule of Rejected Contracts, which shall be deemed rejected on the Effective Date; (3) previously assumed or rejected by a Final Order; or (4) subject to a motion to reject that is pending on the Confirmation Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to sections 365(a) and 1123 of the Bankruptcy Code approving the assumptions, assignments, or rejections of such executory contracts or unexpired leases as set forth in the Plan, the Schedule of Assigned GAC Contracts, and the Schedule of Rejected Contracts.  Each executory contract or unexpired lease assumed pursuant to the Plan or by Bankruptcy Court

order but not assigned to a third party before or on the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume executory contracts or unexpired leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from any rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time will be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against any of the Debtors, the Reorganized Debtors, their respective estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary. A Claim arising from the rejection of any executory contract or unexpired lease shall be classified as a General Unsecured Claim and shall be treated in accordance with <u>Article III.B.4</u>.

Any objection to a proof of Claim arising from the rejection of an executory contract or unexpired lease shall be filed by the later of (1) 180 days after the Effective Date and (2) such other date as may be fixed by the Bankruptcy Court, as such date may be extended from time to time after notice to the U.S. Trustee.

C.      *Assumption or Assignment Notices and Objections to Assumption or Assignment of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, at least 14 days before the Combined Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption or assignment to counterparties to executory contracts and unexpired leases to be assumed or assigned pursuant to the Plan. Any objection to the assumption or assignment of an executory contract or unexpired lease under the Plan must be filed, served, and actually received by the Debtors at least five days before the Combined Hearing or such other deadline established by the Bankruptcy Court. Any counterparty to an executory contract or unexpired lease that fails to timely object to the proposed assumption or assignment of any executory contract or unexpired lease will be deemed to have consented to such assumption or assignment.

D.      *Dispute Resolution*

In the event of a timely filed objection regarding (1) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease

to be assumed or assigned or (2) any matter pertaining to assumption, assignment, or the cure payments required by section 365 of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the executory contract or unexpired lease.

E.    *Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay any Cure Amounts on the Effective Date, or such other terms as the parties to such executory contracts or unexpired leases may agree.  Any Cure Amount shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Amount.  The Reorganized Debtors may settle any Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption or assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned executory contract or unexpired lease at any time before the date that the Debtors assume such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition executory contracts and unexpired leases that have been executed by the Debtors during these chapter 11 cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease.

G.    *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary, any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan.  All such obligations shall be deemed and treated as executory

contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.

Notwithstanding anything to the contrary herein, (1) any indemnification and reimbursement provisions under the Prepetition Credit Agreement or DIP Credit Agreement which are expressly stated to survive any repayment or conversion under, or termination of, the Prepetition Credit Documents or DIP Documents, as applicable, shall survive any cancellation, conversion or discharge under the Plan in accordance with its terms, (2) any rights that the Prepetition Agent or DIP Agent may have under the agency provisions of the Prepetition Credit Documents or DIP Documents, as applicable, shall survive any such cancellation or discharge and (3) all contingent, unliquidated claims arising thereunder shall survive and not be discharged.

H.    *Reservation of Rights*

Neither the inclusion of any executory contract or unexpired lease on the Debtors' Schedules or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.    *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim or Interest becomes Allowed or as soon as reasonably practicable thereafter), the Debtors and Reorganized Debtors shall make distributions under the Plan to each holder of an Allowed Claim or Interest in the full amount of the distributions that the Plan provides for such Allowed Claim or Interest. Except as specifically provided in the Plan or as required under applicable nonbankruptcy law or agreements governing, instruments evidencing, or other documents relating to any Claim, holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.    <u>Record and Delivery Date for Distribution</u>

On the Effective Date, the Distribution Agent shall be authorized and entitled to recognize only those record holders listed on the Debtors' books and records, Schedules, or claims register as of the close of business on the Effective Date unless otherwise agreed by the Debtors.  Any distributions and deliveries to be made under the Plan shall be made on the Effective Date except as otherwise provided by the Plan.

    2.    <u>Delivery of Distributions On Account of Prepetition Credit Facility Claims</u>

All distributions to holders of Prepetition Credit Facility Claims shall be deemed completed when made to (or at the direction of) the Prepetition Agent, which shall be deemed to be the holder of all Prepetition Credit Facility Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this <u>Article VI</u>, the Prepetition Agent shall cause such distributions to be made to or on behalf of such holders in accordance with the Prepetition Credit Agreement.  If the Prepetition Agent is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Prepetition Agent's cooperation, shall make such distributions to the extent practicable to do so.

    3.    <u>No Fractional Shares</u>

No fractional units of New Units shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan would result in the issuance of shares of New Units that is not a whole number, such New Units shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number, and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof.  The total number of authorized shares of New Units to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

    4.    <u>Undeliverable Distributions and Unclaimed Property</u>

If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a holder has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given

notice to the Debtors or Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

C.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

D.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, if the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

E.    *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the holder of such Claim; *provided that* the Debtors and Reorganized Debtors shall not seek to exercise rights of setoff against any Prepetition Credit Facility Claims or any DIP Claims. In no event shall any holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless (a) the Debtors have consented and (b) such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

F.    *Claims Paid by Third Parties*

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, if the holder of such Claim receives payment in full on

account of such Claim from a party that is not a Debtor or Reorganized Debtor.  If a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Claim Allowance Process*

Notwithstanding section 502(a) of the Bankruptcy Code and the Schedules, and except as otherwise set forth in the Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if these chapter 11 cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable nonbankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

Except for (1) proofs of Claim asserting damages arising out of the rejection by the Debtors of an executory contract or unexpired lease pursuant to Article V and (2) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.

For any Claims that are estimated, then notwithstanding section 502(j) of the Bankruptcy Code, any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise shall be entitled to seek reconsideration of such estimation within 21 calendar days after the date on which such Claim is estimated.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the exclusive authority (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    *Distributions After Allowance*

If a Claim or Interest ultimately becomes Allowed, any distributions shall be made to the holder in accordance with the provisions of the Plan.  As soon as reasonably practicable after entry of a Final Order Allowing such Claim or Interest, the Reorganized Debtors shall provide to the holder any distribution to which such holder is entitled under the Plan as of the Effective Date.

D.    *Reservation of Rights*

Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Claim or Interest, including the Causes of Action retained pursuant to Article IV.K.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that any holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution received on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their estates, and holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

B.    *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, regardless of whether any property is distributed or retained pursuant to the Plan on account of such Claims and Interests, and regardless of whether the holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of these chapter 11 cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is unimpaired by the Plan.  The Confirmation Order shall be a judicial determination

of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. Nothing in this Article VIII.B shall affect the rights of holders of Claims or Interests to seek to enforce the Plan, including the distributions to which holders of Allowed Claims or Interests are entitled to receive under the Plan.

C.     *Releases by Debtors*

**As of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and each of their respective current and former affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective estates, including any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including avoidance actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors or their estates would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Prepetition Credit Documents, the DIP Documents, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, the Exit Facility Documents, the Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, or these chapter 11 cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.C do not (1) release any Entity's Effective Date or post-Effective Date obligations, rights, or defenses arising under the Plan or any document, instrument, or agreement assumed or executed in connection with the Plan (including documents, instruments, or agreements included in the Plan Supplement) or (2) affect the rights of holders of Allowed Claims and Interests to receive distributions under the Plan.**

D.     *Releases by Holders of Claims and Interests*

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties shall be and are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged by:**

31

1.  holders of Interests who vote to accept the Plan;

2.  holders of Claims or Interests who are unimpaired under the Plan and who do not timely object to the third party releases provided pursuant to this **Article VIII.D**; *provided that* holders of unimpaired Claims shall not release or be deemed to have released the Debtors or Reorganized Debtors with respect to such unimpaired Claims pursuant to this **Article VIII.D.2**;

3.  holders of Interests whose vote to accept or reject the Plan was solicited but who did not vote either to accept or to reject the Plan and did not opt out of granting the releases set forth in the Plan;

4.  the Committee and its members;

5.  the Prepetition Secured Parties;

6.  the DIP Agent and DIP Lenders;

7.  the Exit Facility Agents and Exit Facility Lenders;

8.  the New Investor; and

9.  with respect to each of the foregoing Entities in clauses (1) through (8), all Related Parties to the maximum extent;

in each case in their capacity as such from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their estates), that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including avoidance actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors or their estates would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Prepetition Credit Documents, the DIP Documents, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, the Exit Facility Documents, the Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, or these chapter 11 cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article VIII.D** do not (1) release any Entity's Effective Date or post-Effective Date obligations, rights, or defenses arising

**under the Plan or any document, instrument, or agreement assumed or executed in connection with the Plan (including documents, instruments, or agreements included in the Plan Supplement) or (2) affect the rights of holders of Allowed Claims and Interests to receive distributions under the Plan.**

E.    *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, these chapter 11 cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, the New Investment Agreement, the NewCo Organizational Documents, the New LLC Agreement, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of these chapter 11 cases, the pursuit of confirmation or consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities or property pursuant to the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

F.    *Injunction*

All entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D, shall be discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.E, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to Article VIII.E with respect to the Exculpated Parties): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such Claims or Interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy

33

Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

G.    *Retention of Causes of Action*

Except as otherwise expressly provided in Article VIII, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of their estates or themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. Except as otherwise expressly provided in Article IV.K, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if these chapter 11 cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any unimpaired Claim not released pursuant to Article VIII may be asserted after the Confirmation Date and the Effective Date to the same extent as if these chapter 11 cases had not been commenced.

H.    *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, or section 510(c) of the Bankruptcy Code, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

I.    *Release of Liens*

Except (1) with respect to the Liens securing (a) the Exit Facilities, and (b) to the extent elected by the Debtors, with respect to an Allowed Other Secured Claim in accordance with Article III.B.2; or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Effective Date*

The following are conditions precedent to occurrence of the Effective Date of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order and such order shall have become a Final Order;

2.      the Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.C;

3.      the conditions to effectiveness of the Exit Facility Credit Agreements shall have been satisfied or waived in accordance with the terms thereof, and such agreements and any other Exit Facility Documents required to be in effect on the Effective Date shall be in full force and effect and binding on all parties thereto;

4.      the conditions to effectiveness of the Investment Agreement and the New LLC Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement and any other related documents required to be in effect on the Effective Date shall be in full force and effect and binding on all parties thereto;

5.      all Restructuring Expenses incurred or estimated to be incurred through the Effective Date shall have been paid in full in Cash;

6.      the Amended Organizational Documents and the NewCo Organizational Documents shall be in full force and effect;

7.      the New Units shall have been issued in accordance with the terms of the Amended Organizational Documents, Investment Agreement, and New LLC Agreement;

8.      the distribution of NewCo Common Stock and Class 7 Cash Payment as contemplated by Article III.B.7 shall have occurred in accordance with the terms thereof; and

9.      any other documents, instruments, and agreements necessary to effectuate the Plan shall have been effected or executed.

B.      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX, other than the condition set forth in Article IX.A.1, may be waived only by consent of the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Subject to the requirements set forth in the Bankruptcy Code and Bankruptcy Rules, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan at any time and may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as so altered, amended, or modified; *provided that* such alterations, amendments, or modifications, if any, that adversely affect the Claims or rights of the Prepetition Secured Parties, the DIP Agent, the DIP Lenders, or the Exit Facility Agents shall require the consent of the affected party, otherwise such affected party shall not be deemed to have accepted such altered, amended, or modified Plan.

Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not affect the treatment of holders of Claims or Interests.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence, or if the Effective Date does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over these

chapter 11 cases and all matters arising out of, or related to, these chapter 11 cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; *provided that*, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (a) the assumption or assignment of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, or liquidate any Claims arising therefrom, including Claims related to the rejection of an executory contract or unexpired lease, Cure Amounts, or any other matter related to such executory contract or unexpired lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to <u>Article V</u>, the Schedule of Rejected Contracts; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate any controversies with respect to distributions to holders of Allowed Claims or Interests;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters (including matters related to Causes of Action), and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection therewith;

8.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in <u>Article VIII</u> and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.F;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

13.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

14.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

18.     enforce all orders previously entered by the Bankruptcy Court;

19.     resolve any cases, controversies, suits, disputes, or Causes of Action related to the Gulfstream Sale Order and the Gulfstream APA;

20.     hear any other matter not inconsistent with the Bankruptcy Code; and

21.     enter an order concluding or closing these chapter 11 cases.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any Exit Facility Documents that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement or Exit Facility Documents that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to <u>Article IX.A</u> and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors and Reorganized Debtors, as applicable, and any holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or Interest has voted on the Plan.

B.      *Payment of Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a proof of Claim or any other request for payment of quarterly fees.

C.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or any guardian of each Entity.

D.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the DIP Agent, or the Committee shall be served on:

**Debtors:**          The NORDAM Group, Inc.
               6910 North Whirlpool Drive
               Tulsa, Oklahoma 74117
               Attn.: Meredith Siegfried Madden and John C.
               DiDonato
               E-mail: Meredith@nordam.com
                       JDiDonato@huronconsultinggroup.com

with copies to:

| | |
|---|---|
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn.: Ray C. Schrock, P.C.; Ryan Preston<br>Dahl; Jill Frizzley; and Daniel Gwen<br>E-mail:  Ray.Schrock@weil.com<br>      Ryan.Dahl@weil.com<br>      Jill.Frizzley@weil.com<br>      Daniel.Gwen@weil.com | Richards, Layton & Finger, PA<br>920 North King Street<br>Wilmington, Delaware 19801<br>Attn: Daniel J. DeFranceschi; Paul<br>Heath; Brett M. Haywood; and Megan<br>E. Kenney<br>E-mail: DeFranceschi@rlf.com<br>      Heath@rlf.com<br>      Haywood@rlf.com<br>      Kenney@rlf.com |
| Al Givray, General Counsel<br>c/o The NORDAM Group, Inc.<br>6910 North Whirlpool Drive<br>Tulsa, Oklahoma 74117<br>E-mail: agivray@nordam.com | |
| **Counsel to the DIP Agent:**  Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn: Elisha Graff; Nicholas Baker; and David<br>Baruch<br>E-mail: egraff@stblaw.com<br>      nbaker@stblaw.com<br>      david.baruch@stblaw.com | Duane Morris LLP<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801<br>Attn: Michael Lastowski and Jarret<br>Hitchings<br>E-mail: mlastowski@duanemorris.com<br>      jphitchings@duanemorris.com |
| **Counsel to the Committee:**  Morrison & Foerster LLP<br>250 W. 55th St<br>New York, New York 10019<br>Attn:  Lorenzo Marinuzzi; Jonathan I. Levine;<br>and Todd Goren<br>E-mail: lmarinuzzi@mofo.com<br>      jonlevine@mofo.com<br>      tgoren@mofo.com | Cole Schotz P.C.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Attn:  Norman L. Pernick and J. Kate<br>Stickles<br>E-mail: npernick@coleschotz.com<br>      kstickles@coleschotz.com |

E.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these chapter 11 cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

F.      *Entire Agreement*

The Plan, Plan Supplement, and the Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and

representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

G.    *Nonseverability of Plan Provisions*

If, before confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided that* at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2)  integral to the Plan and may not be deleted or modified without consent from the Debtors; and (3) nonseverable and mutually dependent.

H.    *Dissolution of Committee*

On the Effective Date, the Committee and any other official committees appointed in these chapter 11 cases will dissolve; *provided that*, after the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (1) Claims or applications, and any relief related thereto, for compensation by Professionals and requests for Allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (2) any appeals of the Confirmation Order or other appeal to which the Committee is a party.  Upon the dissolution of the Committee, the Committee, its members, and the Committee's Professionals will cease to have any duty, obligation, or role arising from or related to these chapter 11 cases and shall be released and discharged from all rights and duties from or related to these chapter 11 cases.

The Professionals retained by the Committee and the respective members thereof will not be entitled to assert any Professional Fee Claim whatsoever for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Committee, except to the extent necessary to file, prepare, and seek entry of an order granting any fee application for compensation for the Committee's Professionals, and to review and prosecute objections (if any) to any Claims or applications, and any relief related thereto, for compensation filed by other Professionals

I.    *Expedited Tax Consideration*

The Debtors or Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

41

J.  *Reservation of Rights in Favor of Governmental Units*

Notwithstanding any provision in the Plan, the Confirmation Order, the Plan Supplement, or other related Plan documents and subject, in each case, to any legal or equitable rights or defenses (including setoff or recoupment) of the Debtors or the Reorganized Debtors under nonbankruptcy law:

1.  Nothing discharges or releases the Debtors, the Reorganized Debtors, or any non-debtor from any claim, liability, right, cause of action, or defense of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, right, cause of action, or defense against any Debtor, Reorganized Debtor, or non-debtor, and all claims, liabilities, rights, causes of action, or defenses of or to the United States or any State shall survive these chapter 11 cases as if they had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such claims, liabilities, rights, causes of action, or defenses would have been resolved or adjudicated if these chapter 11 cases had not been commenced;

2.  All contracts, purchase orders, agreements, leases, covenants, guaranties, warranties, indemnifications, operating rights agreements, grants, awards, equipment, inventory, property, data, drawings, or other interests of or with the United States or any State shall be paid, treated, determined and administered in the ordinary course of business as if these chapter 11 cases were never filed and the Debtors and Reorganized Debtors shall comply with all nonbankruptcy law; and

3.  Without limiting the foregoing:

    a.  The United States and any State shall not be required to file any proofs of claim or administrative expense claims in these chapter 11 cases for any claim, liability, right, cause of action, or defense.

    b.  Nothing shall affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-debtor.

    c.  Nothing shall be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, warranties, indemnifications, operating rights agreements, grants, awards, equipment, inventory, property, data, drawings, or other interests.

    d.  Nothing shall affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors, and such rights and defenses are expressly preserved.

e.      Nothing shall constitute an approval or consent by the United States, nor shall it obviate or waive any party's duties to comply with all legal requirements and approvals under nonbankruptcy law.

f.      Nothing shall relieve any party from compliance with all licenses and permits in accordance with nonbankruptcy law.

Respectfully submitted January 3, 2019

The NORDAM Group, Inc.
Nacelle Manufacturing 1 LLC
Nacelle Manufacturing 23 LLC
PartPilot LLC
TNG DISC, Inc.

By:      */s/ John C. DiDonato*
Name:   John C. DiDonato
Title:    Chief Restructuring Officer

**<u>Exhibit B</u>**

**Financial Projections**

## FINANCIAL PROJECTIONS

A.    *Overview*

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (*see* Article VIII.C of the Disclosure Statement),[1] as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.   In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors prepared the unaudited projected consolidated statement of operations below (the "**Financial Projections**") for the five-year period January 1, 2019 through December 31, 2023 (the "**Projection Period**").

The Financial Projections assume an Effective Date for the Plan of January 31, 2019. Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including an increased risk of inability to meet forecasts and the incurrence of higher administrative expenses, which may then also impact the Financial Projections.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections, or anticipated financial position.   Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims, Interests, or other parties in interest.   The Financial Projections were prepared by the Debtors to present the anticipated impact of the Plan and assume that the Plan will be implemented in accordance with its stated terms.   The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the political environment where the Debtors operate and regulatory changes. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and other uncertainties.   Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth below.

**THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT WITH THE ASSISTANCE OF THE DEBTORS' ADVISORS, AND APPROVED BY THE BOARD OF DIRECTORS OF NORDAM PARENT AND THE INDEPENDENT RESTRUCTURING COMMITTEE OF THE BOARD OF DIRECTORS.**   THE DEBTORS DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC

---

[1]    Unless otherwise defined below, capitalized terms used in this Exhibit shall have the meanings ascribed to such terms in the *Disclosure Statement for First Amended Joint Postpackaged Chapter 11 Plan of Reorganization of The NORDAM Group, Inc. and its Affiliated Debtors* to which it is attached.

ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS' INVESTMENT BANKER AND INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, DO NOT ASSUME RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, OTHER RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS.   READERS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE HEREOF AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH FINANCIAL STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND REORGANIZED DEBTORS.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS

OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS AN ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  **IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF INTERESTS IN CLASS 7 MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

B.    *Key Assumptions to Financial Projections*

The Financial Projections disclosed herein, to the best of the Debtors' knowledge and belief, represent the Debtors' expected results of operations for the Projection Period.  The assumptions and notes to the Financial Projections disclosed herein are those that the Debtors believe are significant to the Financial Projections.  Nevertheless, if events and circumstances do not occur as expected, there will be differences between the projected and actual results.  These differences may be material to the Financial Projections.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety.

The Financial Projections incorporate the Debtors' contemplated operating initiatives and existing conditions in the aerospace industry.  The Financial Projections are further predicated on the assumption that the Debtors will successfully reorganize and emerge from bankruptcy with a viable capital structure and adequate liquidity on an assumed Effective Date of January 31, 2019.

C.    *Assumptions to Unaudited Projected Consolidated Statement of Operations*

**Net Sales.**  Projected net sales is primarily composed of an aggregation of sales at the Debtors' manufacturing and maintenance, repairs, and overhaul services divisions.  Management projected net sales for the manufacturing business using either customer program-specific volume and price per unit assumptions or historical run-rate assumptions for specific products adjusted for management's expectations of future market demand.  Increases or decreases in specific end-customers' aircraft delivery schedules will often be the primary driver of changes to volume assumptions over the Projection Period.  Management projected net sales for the business and commercial markets of the maintenance, repairs, and overhaul services business by primarily using historical run-rate assumptions for specific products adjusted for management's expectations of future market demand.

**Cost of Sales.**  Projected cost of sales is the aggregation of variable (direct) cost of sales and fixed/other (indirect) cost of sales.  Variable costs consist primarily of material, labor, overhead attributable to a specific customer program, and production-related depreciation and amortization.  Fixed/other costs consist primarily of manufacturing plant overhead not attributable to specific customer programs.

1.      <u>Variable Cost of Sales.</u>  Variable cost of sales was projected on a customer program-specific basis using historical or anticipated direct margin as a percentage of net sales or using historical direct margin as a percentage of sales for maintenance, repairs, and overhaul services costs.

2.      <u>Fixed/Other Cost of Sales.</u>  Fixed/other cost of sales was primarily projected based on anticipated monthly run-rates from the last two months of fiscal year 2018.  These periods included the financial impact of the Debtors' cost savings plans implemented in August 2018.  Annual growth rates were applied to the anticipated run-rates for each subsequent annual period.

**SG&A.**  Projected SG&A primarily includes general management, marketing and sales, finance, human resources, information systems, research and development, bank charges, and office-related depreciation and amortization.  SG&A at each business division was primarily projected based on anticipated monthly run-rates from the last two months of fiscal year 2018. These periods included the financial impact of the Debtors' cost savings plans implemented in August 2018.  Annual growth rates were applied to the anticipated run-rates for each subsequent annual period.  Management assumed an offset to SG&A based upon agreed reimbursements under the Global Resolution for shared use of certain manufacturing space with GAC on a monthly basis throughout the entire Projection Period.

**Interest Expense.**  Interest expense reflects the Debtors' anticipated post-emergence capital structure.

**Other Income, net.**  Consists of other income and expenses, including residual restructuring fees necessary to close the Debtors' chapter 11 cases, gains and losses on asset disposals, equity in earnings from subsidiaries, and earnings from non-controlling interests. Projections for these items, except restructuring fees, are primarily based on historical run-rates.

**Income Tax Expense**.  The Debtors assume they will remain pass-through entities for U.S. federal income tax purposes, with the exception of TNG DISC, Inc., which will remain a corporation for U.S. federal income tax purposes.  Income tax expense consists of taxes that the Debtors pay directly, which primarily include foreign taxes consistent with historical results.

**Adjusted EBITDA.**  Net income or EBITDA is also adjusted to exclude the non-recurring impact of restructuring-related professional and financing fees, gains or losses from the sale of assets, and equity in earnings from subsidiaries, to calculate adjusted EBITDA.

**UNAUDITED PROJECTED CONSOLIDATED STATEMENT OF OPERATIONS**

**For the year ending December 31,**

| ($'s in thousands) | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| NET SALES | $ 508,094 | $ 550,706 | $ 577,187 | $ 609,879 | $ 667,990 |
| COST OF SALES | 381,466 | 412,617 | 433,105 | 462,799 | 512,853 |
| GROSS (LOSS) PROFIT | $ 126,628 | $ 138,089 | $ 144,081 | $ 147,080 | $ 155,137 |
| SG&A | 72,916 | 75,984 | 77,683 | 80,011 | 82,534 |
| OPERATING (LOSS) INCOME | $ 55,884 | $ 64,277 | $ 68,570 | $ 69,241 | $ 74,774 |
| INTEREST EXPENSES | (16,931) | (16,991) | (14,281) | (11,075) | (7,601) |
| OTHER INCOME, net | (33,353) | (3,914) | (4,020) | (4,092) | (4,135) |
| (LOSS) INCOME BEFORE INCOME TAX EXPENSE | $ 5,600 | $ 43,372 | $ 50,269 | $ 54,074 | $ 63,038 |
| INCOME TAX EXPENSES | 558 | 586 | 593 | 593 | 580 |
| NET (LOSS) INCOME | $ 5,042 | $ 42,786 | $ 49,676 | $ 53,481 | $ 62,458 |
| ADJUSTED EBITDA | $ 76,938 | $ 85,795 | $ 91,996 | $ 95,311 | $ 102,709 |

**<u>Exhibit C</u>**

**Post-Effective Date Corporate Structure**



* NORDAM Parent will be treated as a partnership for U.S. federal income tax purposes following the Tax-Free Reorganization.